Swift *v.* Delaware, L. & W. R. R. Co.

EDWIN C. SWIFT et al.

*v.*

THE DELAWARE, LACKAWANNA AND WESTERN RAILROAD
COMPANY et al.

[Filed February 11th, 1904.]

1. Permission by a city to a private individual to occupy a public
street with a railroad switch, to be used for his private business, is void,
and a provision for notice by the city before its removal cannot be
enforced.

2. *Gen. Stat. p. 2689 ¶ 221* empowers municipal authorities to make
such contracts with railroad companies as shall secure greater safety
to persons and property, or facilitate other than grade crossings. Under
this statute a city contracted with a railroad company (whose charter
bound it to keep its highway crossings fit for safe and convenient use,
and gave it power to elevate its tracks), to remove certain tracks at a
grade crossing, substituting therefor an elevated crossing.—*Held,* that
the obligation thus imposed on the company was paramount to the con-
flicting one existing by virtue of a prior contract with a private indi-
vidual to maintain a switch and siding, so that the later contract would
not be specifically enforced in equity in any manner, but such individual
would be remitted to his legal remedies.

3. Where all the facts upon which the validity of a contract, specific
performance of which is sought by injunction, appear on the application
for a preliminary writ, and the question involved is one purely of the
application of legal and equitable principles, the fact of loss and in-
convenience to complainants will not justify a preliminary injunction
until the case can be finally heard, it appearing that on the admitted
facts relief must be denied at the final hearing.

On application for preliminary injunction. Heard on bill
and affidavits, answering affidavits and affidavits in reply.

*Mr. Chandler W. Riker* and *Mr. Edward L. Price,* for the
complainants.

*Mr. MacLear* and *Mr. Henry Young,* for the city of Newark.

*Mr. Robert H. McCarter,* for the Delaware, Lackawanna and
Western Railroad Company.

EMERY, V. C.

In its formal aspect, the bill in this case is a bill filed for the purpose of compelling the specific performance by a railroad company of an alleged agreement to maintain an existing siding on the company's land, in connection with its main tracks, and also to maintain an existing switch connecting with the siding and running into the lands of the complainants. This siding has existed in its present location from at least as early as 1869, and the switch running into defendant's lands has existed from 1885. The complainants are wholesale dealers in meats on an extensinve scale, and since the latter date the switch, in connection with the siding, has been used for the delivery of freight to the complainants (or their predecessors in title) by running the cars consigned to them directly to their warehouses, constructed on their lands, across. a street called Morris and Essex Railroad avenue, in or along the lines of which the siding is located.

The switch to the complainants' lands was constructed by the defendant railroad company, the Delaware, Lackawanna and Western Railroad Company, which was then and is now in possession of and operating the railway under a lease made to it, in 1869, by the Morris and Essex Railroad Company. The latter company erected the railway, and also the siding now in question, previous to the lease.. The railroad company, on December 24th, 1903, notified the complainants that it intended, on December 30th, 1903, to discontinue the handling of their business after December 30th, seven o'clock in the morning, unless the complainants procured permission from the city to use their tracks across Broad street for the purpose of switching their cars to them. This notice was given in order that the railroad company might carry out the provisions of a track elevation agreement with the city of Newark for the removal of its tracks from Broad and Plane streets, and the removal of the siding and switch. Thereupon this bill was filed against the Delaware, Lackawanna and Western Railroad Company and the city of Newark to establish the agreement relating to the siding and switch and compel its specific per-

formance, and application is now made for a preliminary injunction restraining both defendants from cutting or disconnecting or in any way interfering with the present tracks, siding or switches leading from the railroad to the storehouses of the complainants, connecting these storehouses with the main tracks, and also for a further injunction restraining them from in any way interfering with the carrying of freight over the main tracks of the railroad from the connecting tracks, sidings and switches, into the storehouses of the complainants. This application is heard upon bill and affidavits, answering affidavits and affidavits in rebuttal, no answers having been filed.

The lands of complainants were purchased in 1883 or 1884, and the title was taken in the name of Edwin C. Swift, one of the complainants. Mr. Swift, in his affidavit, merely says that he purchased them. Mr. Bathgate says that as agent for E. C. Swift, and in his interest and in the interest of the members of the firm of the Newark Beef Company, he (Bathgate) negotiated for and purchased the lands. The portion of the lands situate on the corner of Plane street and Orange street (the first street south of Morris and Essex Railroad avenue), are alleged in the bill to be owned by nine of the eleven complainants who compose the firm called "The Newark Beef Company," engaged in the purchase and sale of beef, and the portion situate on the corner of Morris and Essex Railroad avenue and Plane street are alleged in the bill to be owned by the eleven complainants who compose the firm of Bimbler, Van Wagenen & Company, engaged in the purchase and sale of pork. When the lands, or any of them, were conveyed by Edwin C. Swift to the complainants, and whether it was before or after buildings were erected on the lands, does not appear; but the conveyances to complainants, as set out in the bill, convey to them also the use of the railroad track from the Morris and Essex railroad * * * "so long as said track is connected with the tracks of the D., L. & W. railroad." No conveyance of any interest or right to the use of the siding or tracks of the railroad company appears to have been made. As to the character and scope of the agreement relied on in the bill, the affi-

davits of the complainants show that at the time it was made (in 1885) a siding was already in existence, and that the agreement for the construction of the switch connecting with the siding was a verbal agreement, made between James E. Bathgate, one of the complainants, acting in their behalf, and Andrew Reasoner, division superintendent of the Delaware, Lackawanna and Western Railroad Company for the Morris and Essex division. No writing or memorandum of any kind was executed between these persons, or by any other persons, representing either the complainants or the railroad company.

The agreement, as sworn to by Bathgate, is that it was agreed by the railroad company that Edwin C. Swift, one of the complainants, should have the permanent right to use the said siding or switch, situated on the south side of the eastbound track of the said railroad company, for the purpose of the business of the said Edwin C. Swift and his associates in the Newark Beef Company and his successors in title and his and their assigns, and that it was further agreed that the said railroad would build an additional permanent switch from said siding or switch into and upon the said lands, to be used by the said Edwin C. Swift and his associates, the Newark Beef Company, his successors in title and his and their assigns, for the purposes of his and their businesses; and it was agreed by said Edwin C. Swift, in consideration of said right in said switches and of the building of the last-named switch, that he would erect a permanent storehouse and building on the lands, and would with his associates, his and their successors in business and assigns, there conduct a wholesale storehouse for the sale of beef and other perishable products, and that he and they would use the Delaware, Lackawanna and Western Railroad Company's line in the city of Newark for the transportation of freight in connection with their business. Mr. Frank J. Griffith, a former assistant superintendent of the road under Mr. Reasoner, who was present during some of the negotiations between Mr. Bathgate and Mr. Reasoner and was familiar with their general course, swears to the "understanding" of Mr. Reasoner, himself and the general freight agent of the company, that Swift was to put up a building on the premises owned by him, and equip the same for con-

Swift v. Delaware, L. & W. R. R. Co.

ducting his business from that point, and do his freight business over the Delaware, Lackawanna and Western on condition that the railroad would give to Swift the permanent and prior right to all persons to use the siding on the south side of the east-bound track of the railroad between Plane and Broad streets, and would also construct a permanent switch from said siding into and upon the lands of said Swift, to be used by Swift and his associates in business and those thereafter conducting the business upon the premises for his and their businesses, the said Swift agreeing on his part, immediately after the construction of such additional switch from said siding, to erect and equip his building, and there through himself, his associates and assigns, to conduct the above business and the business of other perishable product, and further

"that it was the intention of all parties, and it was agreed between them, that the use of said siding should be permanent, and should continue as long as the above business, and business in other perishable commodities, was carried on on the property then owned by Swift, and a like agreement extended both to the original siding already constructed on the south side, and to the new switch to be constructed from said siding into the premises of Swift."

On the part of the defendants there are submitted affidavits of Mr. Neafie and Mr. Cornwall and Mr. Bray, employes of the road at the time of the construction of the switch and connected with the matter, and persons who, as is claimed, would have been likely to know if the arrangement was permanent, all of whom say that the construction of the switch was only a construction of the character ordinarily made in connecting with factories and other places of business along the road, and was not, so far as they ever heard, a different or permanent construction. Other affidavits submitted on the part of the defendant in reference to the making of the agreement in question show, or tend to show, that Mr. Reasoner was not a director of the road and that, as division superintendent or otherwise, he had no authority to make any agreement on the part of the company, binding it to the permanent maintenance of the switch and siding in question; that for such agreement the action of the president and board of managers was necessary; that no such

action was taken, and that there is no record or writing of any kind, so far as can be found among the papers or documents of the company, of any such agreement or authority to Mr. Reasoner to' make it. Whether there are any by-laws regulating the power of a division superintendent does not appear.

Rebuttal affidavits are filed on the part of the complainants which show, or tend to show, that Mr. Reasoner in several other instances authorized the construction of switches from the railroad to private lands, and that he did this without consulting any superior authority.

At the time of the construction of the switch leading from the siding into Swift's premises there was a public street called Morris and Essex Railroad avenue, on the south side of the two main tracks and siding of the railroad company. This avenue was formally laid out by the city at this point in 1851 and extended along the north sides of the tracks as well, the whole avenue being laid out eighty feet wide. About 1869, there were disputes between the city and the railroad companies (lessee and lessor) relating to the occupancy of the land included in Morris and Essex Railroad avenue by the siding in question, and on May 5th, 1870, an agreement was made between the city and the Delaware, Lackawanna and Western Railroad Company in reference to the siding and to its use. By this agreement the railroad company agreed to widen the avenue on the south by extending it over lands at the corner of the avenue and Plane street, then owned or controlled by the company and now a part of the complainants' land referred to in the bill, and that when the use of the siding should be abandoned the company would take it up and restore the avenue to its proper line. This widening of the street was carried out and the street as so widened was occupied and used as a public street at the time of the purchase of complainants' lands. This agreement and the acts thereunder recognized the existence of the avenue as a public street. The deed under which complainants claim title to their property on the corner of Plane street and Morris and Essex Railroad avenue (the second tract mentioned in the bill) describes this property as bounding, on Morris and Essex Railroad avenue, refers specially to the agreement of May 5th, 1870,

and conveys to complainants the rights to the land included within the avenue as widened if the switch is abandoned. In order to cross Morris and Essex Railroad avenue with this switch Swift procured on April 3d, 1885, from the city, by resolution of the council, permission to lay a switch across the street. By this resolution

"permission was granted to E. C. Swift, owner of the property lying between the Morris and Essex railroad and the northerly line of Orange street, just east of Plane street, to lay a switch over the intervening space lying between the northerly side of his land to the southerly tract of said railroad, according to the plan attached hereto, at his own expense and under the direction of the street commissioner; provided, that no car or cars are permitted to stand upon the proposed switch on the street; and provided further, that this privilege is granted with the distinct understanding that the council reserve the right to order said switch to be removed at any time by giving thirty days' notice."

This thirty days' notice had not been given at the time of filing the bill, and, as against the city of Newark, the complainants now claim that the switch cannot be removed without giving the notice. The answer of the city to this contention is that this permission to an individual to occupy a public street for his private uses is void, and both the permission and the notice prescribed may therefore be ignored. The decisions in *State, Montgomery, pros.,* v. *Trenton, 7 Vr. 79 (Supreme Court, 1872),* and *Beecher* v. *Newark, 35 Vr. 475 (Supreme Court, 1900),* affirmed on error, *36 Vr. 307,* support this contention, and so far as the city is concerned no injunction can issue against its removal of the switch across the street. Nor can there be, in my judgment, any decree for specific performance against the railroad company of the agreement to maintain a switch for complainants' private use across a public street. By the track elevation contract hereafter referred to, all tracks at grade upon Morris and Essex Railroad avenue are to be removed upon the operation of the elevated structure, and so far as the railroad company is concerned the permission of the city to occupy any portion of the public street (which is the sole foundation of complainants' title in the public street) has been terminated. But while the company cannot be required to maintain the switch

across a public street, the question whether it can be compelled to specifically perform the alleged agreement to maintain for the use of the complainants the siding which is located on its own lands depends upon other considerations. The siding extends across Plane street at grade, parallel with the two main tracks, and runs into the eastbound track a short distance west of Plane street. It does not extend across Broad street (which lies east of Plane) but stops about twenty-five feet west of Broad street, at a point located by the agreement of May 5th, 1870, above referred to. All cars for complainants are now, and were at the time of filing the bill, drawn across Broad street and Plane street on the westbound track and then switched again across Plane street down the siding, so that if the siding is to remain permanently for complainants' use, as located when built, it will be necessary that grade crossings be permanently continued at Broad street and Plane street. The removal of all the tracks and the siding and switch is proposed to be made and is rendered necessary by the terms of the contract entered into between the city and the railroad company (lessor and lessee) on December 26th, 1901. This contract provides, among other things, for the location and elevation of the through main tracks and freight tracks, so as to cross over Broad and Plane (and other) streets on a line about two hundred feet north of Morris and Essex Railroad avenue, and that all tracks at grade upon these streets should be removed upon the operation of the company's trains on the elevated structure. This operation of trains over the elevated structure began on or about December 20th, 1903, and the railroad company, for the purpose of compliance with this part of the contract on its part, gave to Mr. Bathgate, on account of the complainants, the following notice on December 24th, 1903:

"Because of our using our elevated tracks through Newark with our passenger and freight business, we cannot continue to use our old main track across Broad street to switch cars to and from your track, unless you get permission from the city permitting it to be done. We cannot assume the responsibility, and therefore if you do not get permission, on and after Wednesday, December 30th, 7 A. M., we will have to discontinue placing cars."

This track elevation contract was made under the authority of the act of 1874 (*P. L. of 1874 p. 45*), as amended in 1893 (*P. L. of 1893 p. 157; Gen. Stat. p. 2689 ¶ 221*), which authorized the proper municipal authorities of any city of the state to enter into such contracts with any of the railroad companies, whose roads enter or lie within their cities,

"as shall secure greater safety to persons and property therein, or facilitate the construction and maintenance of other than grade crossings of streets, highways or other railroads therein, whereby the said railroad companies, or any of them, may locate, relocate, change, alter grades, depress or elevate their railroads within said cities, or either of them, as in the judgment of such municipal authorities, respectively, may be best adapted to secure the safety of lives and property, or to provide for other than grade crossings of streets or highways, or of other railroads therein, or to promote the interests of said cities, respectively, and for that purpose shall have power to open, vacate, alter the lines and change the grades of any streets or highways, or any part thereof, within said cities, or either of them, and to do all such acts as may be necessary and proper to effectually carry out such contracts, and any such contracts made by any railroad company or companies, as aforesaid, with said cities, or either of them, are hereby fully authorized, ratified and confirmed."

The changes authorized, both in the railroads and streets, are by the act to be such

"as in the judgment of such municipal authorities, respectively, may be best adapted to secure the safety of lives and property, or to provide for other than grade crossings of streets or highways or of other railroads therein, or to promote the interests of said cities, respectively."

The municipal authorities are thus, by the express terms of the act, made the judges of what changes are necessary in order to secure either of these objects, and in the absence of fraud their judgment that the change is necessary is final. This was the opinion of Vice-Chancellor Van Fleet, given in *Dodge* v. *Pennsylvania Railroad Co., 16 Stew. Eq. 351, 362 (1887)*, and his opinion was approved, on appeal, in *18 Stew. Eq. 366 (1889)*. This was a decision growing out of the Jersey City track elevation, under a contract with the Pennsylvania Railroad Company made pursuant to the act of 1874, in which the power

committed to the municipal body was for the general purpose "of securing the changes which in their judgment may be best adapted to secure the safety of lives and property and promote the interests of the city."

The act of 1893 goes further, and makes "the provision for other than grade crossings" an additional and a specific object of the powers granted. This clause of the act seems to be a declaration by the legislature, in the exercise of its police power, that the abolition of grade crossings in cities is of itself a proper and necessary change in the interest of public safety, and while under the act the determination of whether any particular grade crossing or crossings should be removed is left to the final determination of the municipal authorities, and is to be carried into effect by means of a mutual contract between the city and the railroad company, the decision for removal of any grade crossings being thus made and provided for in the manner indicated by the legislature, it would seem that the question of the necessity of the removal of any specified grade crossing could not be further questioned or reviewed. Counsel for complainants question, in this case, the necessity of the abolition of grade crossings on Broad street and Plane street, now that the elevated structure has provided for the traffic which formerly went over these streets, and contend that on this application the court is to be the judge of whether now, and since the elevation of the tracks, it will not be safe for a single track to remain on Broad and Plane streets, to accommodate complainants' comparatively small traffic. But assuming that, in view of the decisions above referred to in the *Montgomery* and *Beecher Cases,* the privilege of thus using streets for the benefit of an individual only can be given or reserved in any manner whatever, it is evident that to allow any railroad tracks to remain for any purpose on grade at Broad street would defeat one of the main purposes of the act and of the contract under it, viz., the entire removal of tracks at a dangerous crossing at grade over the main thoroughfare of a city. If tracks of the company are lawfully in the public streets for any purpose, it can only be under the authority of the railroad charter to use

or cross the public streets, and the tracks must remain for all the purposes of the charter, and the company, if the tracks remain by way of right, must have the right to continue the use of them for all persons up to the limit of safety, or until another contract for removal is made.

I conclude, therefore, that the review by this court of the judgment of the municipal authorities upon the question of the necessity of the absolute removal of tracks at any specified grade crossing is not warranted, and that for the purposes of this application it must be considered that the removal of all tracks at grade, at both Broad and Plane streets, is necessary, under the act of 1893, and the contract made in pursuance of it.

The question, then, is have the complainants such an interest or right in the lands, tracks, siding or switch in question, so far as it is upon lands of the railroad company, as entitles them to prevent the removal of the siding and tracks across these streets, and to require their permanent continuance in their present location?

It is true that the complainants, in their bill and at the hearing, offered to take in substitution for the right which they now claim an elevated switch and siding, but the defendants, on their part, do not offer or intend to make such substitution, and they deny that it can be safely constructed or operated as proposed.

This is, however, a bill for the specific performance of a contract to have a siding and switch in their present location and grade, and connected with the main tracks in their present location, and as the decree can only compel the performance of the contract made, no decree for sidings on any substantially different or other location or grade could go by way of substitution, except by consent of all parties.

The main questions arising on the bill and affidavits and argued on this application are—*first,* whether the agreement set out in the bill in relation to the siding and switch was made by Mr. Reasoner; *second,* whether, if made by him, he had authority to act for the company in making such agreement; *third,* if so made and he had such authority, should the agree-

ment as to the switch be specifically enforced, in view of the· subsequent contract of the company with the city, under the· acts of 1874 and 1893? The present hearing being on application for preliminary injunction before answer, and not on. final hearing, there is, of course,· the further question whether the complainants' case, as now presented, is such as to satisfy the court that they may be able, at final hearing, to make out a case for relief, and if so, whether a preliminary injunction is· necessary in order to ensure ultimate relief in case of final decree· in their favor.

As to the *first* question—whether the agreement was made· by Mr. Reasoner, as alleged—a preliminary inquiry arises relative to the character of the proof. The agreement sought to· be enforced requires the railroad company to permanently maintain certain structures on its own lands and perform certain services thereon, as common carriers, for the benefit of complainants, and also to permanently maintain and operate these structures, in connection with like structures, also to be maintained and operated by the company on the complainants' lands,· so long as a certain kind of business is conducted on these lands of complainants, by either the complainants or their assigns. If the claim of the complainants that an agreement of this character creates in them an interest by way of easement or· otherwise in the lands of the railroad company be correct, and if this interest claimed to have been thus created in complainants' land is, as complainants further claim, a permanent easement in favor of their lands, imposed on lands of the railroad company, then the agreement is a contract in relation to lands, or some interest in or concerning them; and is therefore within the fifth section, paragraph 4, of the statute of frauds and perjuries (*Gen. Stat. p. 1603*), which requires proof by a writing in any action brought on such contract. And if this interest claimed to have been thus created in complainants' lands is, as complainants further claim, a permanent easement in favor of their· lands, imposed on lands of the railroad company, then the agreement comes within the operation of the settled rule· that easements in lands cannot be created by parol agreements,·

which amount only to licenses, but require a writing under seal. *Godd. Easem. (Bennett's ed.) 88; Browne Fraud (4th ed.) § 232.*

My present view is that this agreement for the performance by the railroad company itself of the labor and services on its own lands, required for the maintenance of the siding in connection with its main tracks, does not and was not intended to give to complainants any interest in the company's lands, but was a contract of a personal character collateral to the lands, and was not, therefore, within this clause of the statute. The statute does not bar verbal agreements for erection and maintenance of fences or other fixtures, or other like collateral agreements for services upon lands. *Ivins* v. *Ackerson, 9 Vr. 220 (Supreme Court, 1876)*. Nor does this clause of the statute extend, as I think, to contracts like the present, relating to traffic agreements to be performed by the company, as a common carrier, on its own lands in a particular method, and which do not contemplate or require any possession by complainants of the company's lands. But if this view as to the effect of the contract be incorrect, and an interest in the railroad company's lands was intended to be created, then, inasmuch as the statute of frauds controls courts of equity as well as courts of law, a verbal agreement is not specifically enforceable, unless the case is brought within the exceptions which a court of equity recognizes as taking the case out of the statute. So far as applicable to the present inquiry, these are (1) cases of fraud, being cases where the party charged with the making of a contract, by taking advantage of the statute, would be able to perpetrate a fraud upon the other party by thus holding him to a contract never entered into, and (2) cases of part performance of the contract by the party seeking to enforce it. *Fry Spec. Perf. (4th ed.) §§ 561, 573*. The part performance by complainants in this case was (1) the expenditure of money in the erection of buildings on their own land for their own use, and in which defendant had no interest, and (2) the giving of their freight business to the defendant company. My present view is that it is very doubtful whether these considerations

are sufficient to take the case out of the statute, on either the ground of fraud or part performance. But in view of the fact that the answer of the defendant has not been put in, and of the serious inconvenience to the complainants in the prosecution of their business as at present conducted if the siding is removed, I would, if this were the only or were the decisive question in the case, and if the company proposed, in the ordinary transaction of its business, to continue the use of its main tracks across Broad and Plane streets, be disposed to preserve the *status* which has existed for nearly twenty years until the hearing, or at least until the answer came in. In reference to the *second* question—Mr. Reasoner's authority—my view is that, on the present affidavits, the authority to act for the company in making an agreement of this permanent character is not satisfactorily shown, but for the reasons above given, and the additional reason that proofs as to the exact authority of Mr. Reasoner in the premises could not be expected or required of complainants upon this preliminary *ex parte* application, I would also, if this were a decisive question and only the private interests were involved, be inclined to preserve the existing situation until answer and opportunity for full proof at final hearing as to his authority. The vital points, in my judgment, on this application arise under the *third* question—as to the validity and effect of this agreement—assuming that it was made by the company.

In view of the subsequent contract made by the company with the city, under the acts of 1874 and 1893, for the removal of its tracks, is the agreement with the complainants, if proved, one which a court of equity should specifically enforce? In my judgment it should not, and for the reason that the track elevation contract was one made for the purpose of carrying out obligations imposed upon the company in the interest of public safety, which are paramount to the private interests of the complainants, and the performance of these public obligations should not be interfered with or prevented by the specific enforcement of complainants' supposed private rights. The railroad company at the time of the alleged contract was, under

the express terms of its charter, chargeable with the duty to keep, at all times and under all circumstances, the public highways where they cross their railroad in a condition fit for safe and convenient use, and for this purpose had power, when public exigencies required, to elevate their tracks or alter the grades of highways. *Central Railroad Co.* ads. *State, 3 Vr. 220 (Supreme Court, 1867)*; *Newark* v. *Delaware, Lackawanna and Western Railroad Co., 15 Stew. Eq. 196 (Van Fleet, V. C., 1886)*. Under the general law of the state as it existed prior to 1874, both the railroad and the municipal authorities were charged with the duty of providing for the public safety, and for carrying out this purpose were empowered, by the statute of 1874, to mutually agree upon the elevations or changes to be made. *Read* v. *Camden, 24 Vr. 322, 326 (Supreme Court, 1891)*. This statute was in force at the time of the agreement now in question. By the act of 1893, similar powers were granted to both companies, which were charged with similar duties in reference to the removal of grade crossings.

As to the validity of any contract made by a railroad company for such a private use of or interest in its lands used for its railway or any of its appurtenances as would prevent its performance of these public obligations, to arrange for the public safety by the removal of grade crossings in cities, my view would be either that the contracts are altogether void or that they must be considered as made and taken subject to any contract subsequently made to remove its grade crossings. Contracts of this character, for the permanent location or use of their road or works, have been held to be subject to termination when even the interest of the road itself requires it. "Railroad companies, while private corporations, are *quasi* public agencies, engaged in the performance of public duties, and contracts which prevent them from the discharge of these duties cannot be sustained." *E. & S., &c., Railway Co.* v. *McDevitt, 24 Sup. Ct. Rep. 36 (U. S. Supreme Court, October Term, 1903)*. This case was an action at law for damages for breach of a contract made on securing the right of way to operate an extension of the railroad over a particular track, and it was held that damages could not be based on the company's obligation to continue permanent

use under the contract. But the precise question here is narrower, and is this: Should the contract be specifically enforced in equity, or should the party, if the contract be a valid contract, be left to his remedy at law? This was the course directed in *Society, &c., for Establishing Useful Manufactures* v. *Butler, 1 Beas. 498 (Errors and Appeals, 1859)*, where the court refused to specifically enforce an agreement for the supply of water, upon the ground that the company was incorporated for *quasi* public purposes and to supply water to a community, and that, inasmuch as the performance of the company's contract with complainant would prevent its furnishing water regularly to a large number of its lessees, the contract should not be specifically enforced but the complainant should be left to his remedy at law.

In *Texas and Pacific Railroad Co.* v. *Marshall, 136 U. S. 393,* the supreme court of the United States refused to specifically enforce the performance of a contract by a railroad company for the location of its shops and other buildings.

In *Beasley* v. *Texas and Pacific Railroad Co., 191 U. S. 492 (1903)*, a case reported since the argument of this case, specific performance was also refused of a contract not to locate a station within certain limits, made with the vendor of the lands as part of the consideration for the conveyance to the company. The reasons were—*first,* that courts of equity were not inclined to specifically enforce contracts of this character when paramount interests would be interfered with by such action, and that the railroad company should be left at liberty to follow the course which its best interests and those of the public demand; and *second,* that the location of stations was a matter within the authority of a railroad commission, and the court would not, by issuing an injunction, create a situation which might give rise to a possibility of conflict, nor would it, in a suit to enforce the contract, review the judgment of the railroad commission as to the necessity for a station within the prescribed limits.

The agreement set up by complainants in this case, that they are entitled to have the switch and siding retained in their present location and with their present connection with the main tracks for use in their business, if specifically enforced, would

4

retain permanently (or at the will of complainants) the grade crossings at both Broad and Plane streets and prevent both the city and railroad company from removing them under any laws now in force. I cannot consider that any such operation or effect should be given to any contract made by the railroad company for the private use of their tracks. If it can and should be given, then any railroad company, by its contracts, will be able to give to private individuals, for their own uses, the control of track elevations and the abolition of grade crossings in the cities.

The brief of counsel, submitted after the oral arguments, suggests that compensation may be made by condemnation proceedings, but evidently cases of this character are not within the scope of any laws for condemnation now in force. Taking complainants to have an interest in the railroad lands, it is an interest in their continuous maintenance and operation across Broad and Plane streets to the siding in question. The city has no power to condemn the railroad company's lands or any interest therein; nor has the railroad company any power, under its charter or otherwise, to condemn interests in its own lands for the purpose of abandoning the operation of its railroad. If complainants are entitled to compensation for the termination of this contract, the compensation must, as I think, be obtained by an action for the damages sustained by its breach, and the jurisdiction of a court of equity in reference to the agreement should in any event not be exercised further than may be necessary to give such equitable relief in reference to the proof of the existence of the contract as will allow an action at law to be brought. Whether, on a bill filed for that purpose, relief can be given is not intended to be now decided.

The loss or inconvenience to the complainants, even if it be as serious as their affidavits claim, is not a sufficient reason for granting a preliminary injunction if the court is of opinion that no relief would be granted on final hearing for reasons apparent on the preliminary application. This is my view of the *status* of the complainants on this contract, assuming it to be in writing and under the seal of the company. Treating the contract as on this basis, all the facts upon which its validity as against the agreement for removal in the tract

Swift v. Delaware, L. & W. R. R. Co.

elevation contract depends appear upon the affidavits, and the question of its validity and effect has been fully argued.    The question involved is one purely of the application of legal and equitable principles, and there is no reason for reserving decision upon it for final hearing.    On the contrary, it may on an application of this character properly be made a preliminary question in order that delay and expense may be avoided, and that decision of a question in which important public interests and rights are involved may not be delayed pending the settlement of a dispute as to the existence of the contract, which dispute, if settled in favor of complainants, will not be decisive of the case.

This conclusion disposes of the present application for preliminary injunction and of complainants' right to the relief of specific performance of the agreement if proved, which is the object of the bill.    The briefs submitted after the oral argument insist that complainant, as the owner of property rights in property to be affected by the track elevation contract, is entitled to a preliminary injunction restraining interference with such property rights until compensation be made.    But this bill cannot be considered a bill for that purpose.    The questions arising on such a bill are of an entirely different character.    On such a bill the right set up must be one already recognized as valid, and generally no preliminary injunction is granted if the right is doubtful.    *Hinchman* v. *Paterson Horse Railway Co., 2 C. E. Gr. 75; Halsey* v. *Rapid Transit Street Railway Co., 2 Dick. Ch. Rep. 380.*    I have not been referred to any act allowing condemnation of rights of this character.    The view which I have taken, that the agreement should not be specifically enforced because of the execution of the track elevation agreement, extends to its enforcement in any manner, and for the same reasons the enforcement of the agreement by injunction until compensation could not be allowed if the present bill be considered appropriate for that relief.

The application for a preliminary injunction is denied.