No. 19,062.

THE CITY OF EMPORIA, *Plaintiff*, V. THE ATCHISON, TOPEKA & SANTA FE RAILWAY COMPANY, *Defendant*.

SYLLABUS BY THE COURT.

1. CITY ORDINANCE—*Requiring Undergrade Street Crossing— Subject to Review for Unreasonableness.* An ordinance. of a city of the second class enacted pursuant to section 1 of chapter 106 of the Laws 1913, providing that the mayor and commissioners shall have power to compel railway companies to construct such viaducts over and tunnels under streets or tracks as the mayor and commissioners may deem and declare to be necessary for the safety and convenience of the public, is subject to review by the courts for unreasonableness, and if found to be unreasonable the courts may decline to compel compliance with its terms by writ of mandamus.

2. SAME—*Railroad Company Not Compelled to Obey Unreasonable Ordinance Requiring a Subway Under Its Tracks.* A city ordinance relating to the construction of additional railway tracks and switches across a street, accepted by the railway company and providing that the railway company shall restore the street to such a condition as shall not obstruct the public use and keep the crossing in such condition as the city may direct, does not bind the railway company to obey an unreasonable ordinance requiring it to carry the street under its tracks by means of a subway.

3. SAME—*Findings of .Fact by Commissioner—Show Ordinance to be Unreasonable.* Findings of fact returned by a commissioner appointed for the purpose considered, and held that an ordinance of the plaintiff requiring the defendant to construct a subway for a street under its tracks is unreasonable and should not be enforced by writ of mandamus.

Original proceeding in mandamus. Opinion filed April 10, 1915. Writ denied.

*Edwin S. Waterbury*, and *Gilbert H. Frith*, both of Emporia, for the plaintiff; *J. Harvey Frith*, of Emporia, of counsel.

*William R. Smith*, of Topeka, *William Osmond*, of Great Bend, and *W. L. Huggins*, of Emporia, for the defendant.

The opinion of the court was delivered by

BURCH, J.: The action is one of mandamus to compel the defendant to construct an undergrade street crossing. The cause was referred to a commissioner who was directed to return findings of fact and conclusions of law. His report is appended hereto. ·

The ultimate conclusion of fact, that the action of the city in ordering the subway was not without support in reason and consequently was a valid exercise of legislative power, is advisory only. The conclusion of law depends entirely upon the character of the ultimate conclusion of fact. The conclusion of fact having been challenged by the defendant, the court is required to exercise its own judgment and derive its own inference from the specific facts found in detail.

In cases of this character it is not enough that there be a scintilla of reason for the enactment of the ordinance which is assailed, which the report as a whole shows was all the support the commissioner was able to find for the ordinance under consideration. The question is whether or not, considering the entire situation and all the circumstances, the action of the city so far fails to measure up to the fair and just and reasonable as to make it clear that such action is arbitrary, capricious, unreasonable, and oppressive. (*City of Emporia v. Railway Co.*, 88 Kan. 611, 129 Pac. 161.) If the change of grade of both Congress street and State street by the ordinance of 1912 had been followed by a single ordinance requiring subways on both streets, it could not be doubted that such action would have been manifestly unreasonable. A subway upon one or the other of these streets could be justified, but no occasion existed, suggested by the progress of the city's development, past or prospective, or by the public safety and convenience, which suddenly demanded the construction of two subways on opposite sides of the same narrow block, costing between forty and fifty thousand

dollars. The city can not by indirection do that which would have been clearly unreasonable if undertaken directly. Nothing would be gained by debating the facts further than the commissioner has done, and the court concludes that the ordinance is unreasonable and void.

The city contends that it has the right to stand upon the naked statutory power to require subways, and cites in support of its contention those decisions which hold that when particular municipal power is conferred by statute the legislature has settled the question of the reasonableness of ordinances enacted pursuant to the grant. The subject is alluded to in section 600 of Dillon on Municipal Corporations, which reads as follows:

"Where the *legislature, in terms, confers upon a municipal corporation the power to pass ordinances of a specified and defined character,* if the power thus delegated be not in conflict with the Constitution, an ordinance passed pursuant thereto cannot be impeached as invalid because it would have been regarded as unreasonable if it had been passed under the incidental power of the corporation, or under a grant of power general in its nature. In other words, what the legislature distinctly says may be done cannot be set aside by the courts because they may deem it to be unreasonable or against sound policy. But where the power to legislate on a given subject is conferred, and the mode of its exercise is not prescribed, then the ordinance passed in pursuance thereof must be a reasonable exercise of the power, or it will be pronounced invalid." (Vol. II, 5th ed., p. 943.)

Like all attempts to draw a circle which shall be the unit of measurement of angular facts, the text quoted is only approximately successful and has sometimes been applied without discriminating care. Statutes of the first class may be illustrated by those which authorize cities to impose penalties for the violation of ordinances relating to specified subjects in a sum, for example, not less than five dollars and not more than five hundred dollars. An ordinance imposing fines anywhere within the statutory limit must be regarded as reasonable. A

statute which authorizes cities to regulate the speed of
trains within prescribed rates of speed belongs to the
same class.   The reasonableness of an ordinance which
does not transgress the statutory limits can not be
questioned because the legislature has defined its precise
character.   Where a statute forming the charter of a
city expressly provides that the city may compel any
railroad to erect gates at any and all street crossings,
the reasonableness of an ordinance requiring gates at
particular crossings can not be investigated by the
courts because the legislature has established the defi-
nite policy of gates at all crossings without leaving the
determination of the question of what the public safety
and convenience demand to the city.   (*Chesapeake &
O. Ry. Co. v. City of Maysville,* 24 Ky. Law, 615, 69
S. W. 728.)   These illustrations are sufficient to indicate
the true meaning and proper application of the rule.

The statute relating to viaducts and subways at street
crossings in cities of the second class is of the kind re-
ferred to in the latter part of the text quoted.   The
particular provision is found in a general grant of
power to regulate the crossing of railway and street-
railway tracks, and declares that the mayor and council
or mayor and commissioners shall have power to com-
pel railway companies owning or operating railroads
or street railroads to erect, keep in repair, and recon-
struct such viaducts over or tunnels under streets or
tracks as may be deemed and declared by the mayor and
council or mayor and commissioners to be necessary
for the safety or convenience of the public.   (Laws
1913, ch. 106, § 1.)   The legislature did not determine
that the public welfare requires the construction of
viaducts or subways at every railroad or street-railway
crossing which may be designated by city ordinance.
If it had done so, the instance of the branch line of
railroad used as an illustration by the commissioner, to
say nothing of the plight of street railways generally,
might raise the question of the constitutionality of the

46—94 KAN.

statute. Instead of this, as in most statutes specifying matters upon which cities may legislate, the subject of the necessity for viaducts and subways as means for promoting public safety and convenience was committed entirely to the governing body of the city for such legislative action as its sound judgment and wise discretion may suggest. Should a city upon due consideration conclude that the public welfare requires the construction of a particular viaduct or subway, procedural methods are prescribed for obtaining the desired ends. But the propriety of a viaduct or of a subway as a means of satisfying the public need at some particular crossing is not settled in advance by the legislature but must be determined by the city for itself in the light of all the facts which should appeal to fair and candid minds. As the commissioner points out, the statute is merely declaratory of a power which existed before the statute was enacted—the same power which without the statute sustained the ordinance of 1912 requiring the building of the first subway.

As this court said in the case of *Swift v. City of Topeka,* 43 Kan. 671, 23 Pac. 1075, the tyranny of the American system of government very largely consists in the action of municipal authorities, and the judgment and discretion contemplated by the statute are that lawful judgment and that lawful discretion which must always be restrained within the boundaries of reason. (*Anderson v. City of Wellington,* 40 Kan. 173, 19 Pac. 719; *Crawford v. City of Topeka,* 51 Kan. 756, 33 Pac. 476; *Kansas City v. McDonald,* 60 Kan. 481, 484, 57 Pac. 123; *Paola v. Wentz,* 79 Kan. 148, 98 Pac. 775.)

In *Anderson v. City of Wellington,* supra, it was said:

"The power to pass a city ordinance must be vested in the governing body of the city by the legislature in express terms, or be necessarily or fairly implied in and incident to the powers expressly granted, and must

be essential to the declared purposes of the corporation —not simply convenient, but indispensable. . . . In addition to this, the ordinance must be reasonable; not inconsistent with the laws of the state; not repugnant to fundamental rights; must not be oppressive; must not be partial or unfair; must not make special or unwarranted discriminations, and must not contravene common right. These restrictions upon the power of the common councils of cities in this country have been frequently imposed, and almost universally recognized in all the courts of last resort that have expressed opinions upon the subject." (p. 176.)

In the case of *Paola v. Wentz,* supra, the syllabus reads:

"Assuming that the question whether a shade tree growing in the street should be removed is one to be determined by the city officers, not subject to review by the courts, yet in order for their determination to be conclusive it must be made fairly and in good faith; if made arbitrarily, action under it may be enjoined as an abuse of discretion." (Syl. ¶ 1.)

Whether or not an ordinance is void because unreasonable is a question of law (*Lebanon v. Zanditon,* 75 Kan. 273, 89 Pac. 10), and in determining the question of reasonableness " 'The courts are not bound by mere forms, nor are they to be misled by mere pretenses. They are at liberty—indeed are under a solemn duty—to look at the substance of things whenever they enter upon the inquiry whether the [legislature or a city council] has transcended the limits of its authority' " (*City of Lyons v. Cooper,* 39 Kan. 324, 328, 18 Pac. 296).

The city argues in its brief that its action may be rested upon the contract right created by the ordinance of 1899. The petition presents no such claim. Beyond this, the ordinance of 1899, which contained no reference to a subway, took the place of an unaccepted ordinance of 1898 providing for a subway at State street, and the general language of the ordinance of 1899 did not bind the defendant to obey directions falling out-

side the scope of the city's power because unreasonable. Without the contract the city could do whatever the public safety and convenience demanded. With the contract it could do no more. Furthermore, if it were a mere matter of compelling compliance with a contract, the court would exercise its discretion over the issuance of the writ of mandamus in such a way that its process would not be turned into an instrument for the accomplishment of the unreasonable and the unjust. (*The State, ex rel. Wells, v. Marston*, 6 Kan. 524; *A. T. & S. F. Rld. Co. v. Comm'rs of Jefferson Co.*, 12 Kan. 127; *The State, ex rel., v. Stevens*, 23 Kan. 456; *Rice v. County Board of Canvassers*, 50 Kan. 149, 153, 32 Pac. 134; *City of Potwin Place v. Topeka Rly. Co.*, 51 Kan. 609, 33 Pac. 309.)

The plaintiff further contends that the principles of law which led the court to award a writ of mandamus compelling the defendant to construct a subway at Congress street (*City of Emporia v. Railway Co.*, 88 Kan. 611, 129 Pac. 161) require a judgment compelling the defendant to construct another subway at State street, two hundred and eighty feet away.

The principles of law announced in the former case are sound and are adhered to in every particular. That case, however, was decided on a motion for judgment on the pleadings, and a radically different state of facts is disclosed by the present record.

In the former case the fill across Congress street and State street on which the defendant's tracks are laid appeared to be an unlawful obstruction to travel. It was admitted that benefit would result from the opening of Congress street. The defendant being a wrong-doer was not in position to ask the court to weigh the public benefit resulting from an abatement of its barricade. The natural result of the removal of the fill was an overhead railway crossing. The details of the proposed plan were not criticized, public safety and convenience would be measurably promoted, and the defendant, being called upon to obviate in a practicable

way the consequences of its own wrong, was not in position to complain of the cost. The opening of another street crossing in that vicinity between the portions of the town separated by the defendant's tracks was well within the city's power. A subway was not beyond the pale of reason although street crossings of that character are very expensive, and the location of a costly structure of that kind, whether at Congress street or at State street, was a matter for the city to determine according to its best judgment. It now appears that the railroad tracks were laid on Third street under an ordinance granting the use of the street for that purpose and on a grade either established by or satisfactory to the city. This grade was recognized and fixed by ordinance in 1889, remained the lawful grade until the plaintiff conceived its subway schemes in 1912, when the grade was lowered eighteen feet, and considerable sums of money were expended on the faith of the ordinances establishing the original grade. For many years, during which conditions have remained practically constant, the demand for any new crossing at all in this vicinity has not been great enough to invoke positive action by the various city administrations, all charged with the promotion of the public welfare. The duty of the defendant to make State street usable is not disputed, and the sole question before the court is the reasonableness of the proposed method. Shall it be by a subway costing something less than twenty-five thousand dollars when a grade crossing can be put in for less than three thousand? The elements to be considered are the amount of traffic, the public safety, and the public convenience. The commissioner states that a grade crossing will so nearly answer all the demands of traffic that an order to build the subway would be confiscatory. The amount of traffic being so small, opportunities for injury from a grade crossing and inconveniences from standing or passing trains are correspondingly reduced in number.

Whatever need there may be of communication between the portions of the city lying north and south of the defendant's tracks and east of Neosho street, free from such delay as the defendant's trains occasion and free from such dangers as are incident to a grade crossing, is well supplied by the subway already built, and the cost of another subway but a single block from the first is entirely disproportionate to the benefits it would confer. As the commissioner suggests, the public need would assume an entirely different aspect if the city were spending its own money instead of the money of a railway corporation. The result is the ordinance requiring the second subway is quite arbitrary and without fair or substantial basis in reason.

The mislocation of the subway at Congress street and the expenditure of money in improving State street at the grade established by the preliminary ordinance of 1912 are regrettable consequences of the city's arbitrary determination to force the defendant to put in a series of subways, which must fall upon the city. They are not facts to be considered in determining the reasonableness of the city's conduct.

The writ is denied.

### REPORT OF COMMISSIONER.

#### "STATEMENT.

"The defendant railway company has occupied for more than forty years Third avenue in the city of Emporia as its right of way for tracks and switches, under an ordinance more specifically set out in the findings. Its tracks are laid upon an embankment, which obstructs traffic at the intersection of State street. The city of Emporia passed an ordinance by the terms of which the defendant was required to open State street and construct a subway for traffic underneath its tracks. The defendant refused to comply with this ordinance, and this action in mandamus resulted. Responding to the writ, the defendant has set up that such proposed subway would incur a great expenditure on its part, and by reason of its location and

surroundings, and by reason of the fact that it has just completed a similar subway at a point less than one hundred yards distant, and that by reason thereof and other facts set out more in detail in the findings, the action of the city council deprives it of property without due process, and violates other constitutional privileges. A claim was also set up that a conspiracy existed among the city officials of Emporia to oppress the defendant, and that this action was in pursuance thereof and was conceived in malice and prompted by bad faith and improper motives. This defense has been abandoned.

"The only question of fact in the case, then, is whether or not, under the rules of law applicable thereto, the action of the city of Emporia amounts to such an abuse of power as to render it void. In order that the court may have the benefit of the facts upon which the conclusion of the commissioner is based, some of these facts are set out in the accompanying findings.

## "FINDINGS OF FACT.

"I. The defendant company has occupied Third avenue in the city of Emporia from the east to the west end of the town as its right of way for tracks and switches for more than forty years. Its right upon this avenue is not contested except in so far as it may obstruct cross streets. The title to the right of way, subject to the license of the defendant, is in the public.

"II. The ordinance which gave to the defendant the right to use Third avenue was passed in January, 1870, and confers upon it—

" 'The privilege and authority to construct a single track for its railway through the said town from east to west upon either of the avenues of said town south of Fourth avenue, and upon the center of the avenue upon the grade which shall hereafter be established by the city engineer, under the authority of this board, and the said company shall have the privilege and authority of maintaining and operating said railway track so constructed, forever, for the uses and purposes for which the same shall be constructed. . . . And the said company shall put in and maintain good and proper crossings, wherever the said track shall be crossed by the streets of said town.

" 'That if the said railroad company shall file its acceptance of the privileges conferred by this ordinance

within thirty days from its passage, the inhabitants of the town of Emporia shall be thereafter forever barred hereby.

" 'That as soon as said railroad company shall have signified in writing to the chairman of the board, the avenue through which it proposes to build its railway, said chairman shall direct the city engineer to at once proceed to establish the grade of said avenue, which, being so established, the railroad company may thereafter at once proceed to construct said railway upon said grade.

" 'That nothing contained in this ordinance shall be construed as relinquishing, qualifying or exhausting any power conferred by law on this board in controlling said railroad company in the operation of said road through said town.'

"It is also provided that the company shall never operate its trains at more than six miles per hour, which still is effective.

"There does not seem to be any one who knows whether or not a grade was actually established by the city authorities at this time. The first record of a grade is that hereafter referred to, made in 1889, which is at the top of the embankment upon which the tracks are laid. It is a fact, however, that this ordinance was accepted, and that shortly thereafter the defendant did lay its tracks upon Third avenue in the city of Emporia, upon an embankment of the present height. It is probably safe to assume as a fact that the terms of this ordinance were complied with, since there is no record of any objection or protest being made to the establishment of the tracks where they now are, and no intimation that they were constructed without the city having established a grade as agreed to in this ordinance.

"III. Accompanying this report, and as one of its findings, is a sketch of the streets, and the distances between them, which cross the tracks in the vicinity of State street. Alleys have been platted, running north and south through the blocks on each side of the tracks, but none of them has ever been opened, but are obstructed by the tracks of the defendant.

"IV. There is no record of any grades having been established by ordinance on any of the streets in this vicinity prior to the year 1889. In that year an ordinance was passed which established the grade upon State street (the one in controversy), which carried the

proposed line of the surface of the street from Second avenue with a gradual rise to the top of the defendant's embankment on Third avenue, and from Fourth avenue with a gradual rise to the top of the defendant's embankment.

"The actual level of the ground is some ten feet on the south and seven feet on the north below the top of this embankment. The defendant's track was located upon the general level of Third avenue, which is almost level clear across town, with the exception of a draw at Congress and State streets, which made this embankment necessary to overcome.

"There are now four tracks upon this embankment at this place; it is not in evidence just when these tracks were laid, but at least two of them were laid since 1889.

"The 1912 ordinance changing the grade lowers the grade of State street at its intersection with Third avenue about eighteen feet below the grade of 1889.

"V. In April, 1898, an ordinance was passed granting to the defendant the right to remodel and extend its switches on Third avenue. One paragraph of said ordinance provided:

" 'That said railroad company shall at its own expense within one year from the taking effect of this ordinance construct a subway under said railway tracks on said Third avenue at its intersection with State street.'

"This ordinance had a provision that it should only be binding upon a written acceptance filed by the defendant. It is admitted that no such acceptance was filed.

"The next year, however, in 1899, an ordinance was passed and accepted in writing, and acted upon by the defendant, which carried, with one small exception, the same rights as did the 1898 ordinance referred to above.

"The clause referred to above with reference to constructing a subway was not carried forward into the 1899 ordinance. Otherwise the ordinances are almost identical in phraseology. One paragraph of the ordinance of 1899, which is still effective, and which was also present in the 1898 ordinance, is as follows:

" 'That after the construction of said additional tracks and switches, the said railway company shall restore said Third avenue to such a condition as that the construction and maintenance of such additional tracks or switches shall in no wise interfere with or obstruct the free and public use of said Third avenue at all points

where the same is intersected and crossed by other streets and the said railway company shall at all times keep the crossings of said Third avenue where the same is intersected and crossed by other streets in such condition as the city council may from time to time direct and shall not allow their cars to stand on either of the main tracks or side tracks in violation of any existing or future ordinances.'

"This ordinance carries a provision that it is a contract between the city and the defendant.

"VI.   Other ordinances, containing clauses similar to the one last quoted, were passed from time to time conferring privileges upon the defendant with reference to additional sidings, tracks and switches.

"VII.   State street was a regularly platted and laid out street intersecting Third avenue prior to 1870. Whether there was actually a traveled road, or a crossing, at State street at that time is not shown by the evidence.

"There is evidence that there was no town south of the tracks at that time, nor any regularly laid out roads. 'The condition of the streets,' the only witness on the subject put it, 'was practically that of the naked prairie country.'   There was a farming community both south and southwest of Emporia.   The only road mentioned in the evidence meandered in across the prairie from the southwest, and probably crossed Third avenue west of State street.   This is the best recollection of the oldest inhabitant; moreover, these prairie roads follow the 'raises' and not the 'draws.'   State street was in a depression.   This road, I find, did not cross at State street; whether there was another road that did, is not in evidence.

"VII*a*.   Emporia is a city of the second class.

"VIII.   On the 6th day of June, 1911, the city of Emporia passed a resolution to gutter and pave Congress street, which is less than one hundred yards east of State street.

"On the 25th day of April, 1912, an ordinance was passed changing the grade of both Congress and State streets down to a point some eighteen feet below the top of the defendant's embankment on both streets.

"On the 30th day of April, 1912, the city passed an ordinance to open Congress street and to compel the defendant to construct a subway thereunder.

City of Emporia v. Railway Co.

"The defendant resisted this ordinance in the courts, but a writ of mandamus issued in January, 1913, compelling the defendant to construct a subway at Congress street, which it did that year at a cost of about twenty thousand dollars.

"On the 22d day of May, 1913, the city passed an ordinance to open State street and to compel the defendant to construct a subway under its tracks upon that street, which was amended in form on June 10, 1913. These ordinances are attached to the petition in this case.

"IX. Public notice conforming to the statute of the ordinances changing the grade, of the appointment of appraisers, and of a meeting of the city council to hear objections, the report of the appraisers, and the time and place of such meeting was given by the city. This notice was directed to 'All owners of property or other persons interested or affected by such change of grade.'

"No allowance was made to the defendant by the appraisers. The defendant company did not appear at such meeting, nor did any other person, to protest.

"Immediately after the amendatory ordinance of June 10, 1913, was passed the city let a contract for the excavation to bring the street to grade, for the paving, the guttering and drainage system, for the work on State street, and work was commenced thereunder immediately. This work has been completed and the paving extends from Second avenue on one side and Fourth avenue on the other down to a point about a hundred feet distant from the defendant's embankment. This situation is shown by photographs which are attached to this report.

"No formal refusal of the defendant to comply with the State street ordinance had been made at the time this contract was let by the city, but it was understood by the officials responsible therefor that the construction of the subway necessary to connect the two ends of the paving would meet with the opposition of the defendant.

"X. The paving contemplated by the State street ordinance and now constructed extends five blocks south of the railroad embankment, and one block north, at which point it connects with the city's paving system on the north side; the Congress street paving is of the same extent and joins with the city's paving system in the same way as the State street paving. Parts of

two blocks of paving will be dead ends, and of little value as paving, without the subway joining them.

"XII. Congress street is located 280 feet east of State street, from inside curbs. Neosho street is 370 feet from center to center of State street. There is a good, serviceable planked grade crossing at Neosho street. Neosho street is blocked by trains to some extent. The passenger trains that make the station stop block that crossing from three to five minutes. Of these there are twelve that pass through between six in the morning and ten at night and seven between ten at night and six in the morning.

"There are probably between fifteen and twenty freights that pass over Neosho street, none of them, however, stopping regularly across crossings, and the length of time taken to pass across depends upon the length of the train. This time runs from two to four minutes. A flagman is maintained by the defendant at Neosho street.

"XIII. There are other grade crossings east of Congress street and two grade crossings west of Neosho street.

"XIV. There is a water crane at present located on the west line of State street. As a rule only eastbound passenger trains water there, all freight trains watering in the yards. An eastbound passenger engine watering at this crane would obstruct the grade crossing at State street. During periods of heavy traffic a few of the heavier passenger trains making a station stop at Emporia would block both State and Neosho streets.

"XV. All trains of defendant company stop at Emporia. State street is one block from the passenger depot and three blocks from the entrance of the freight yards. Because of this, trains passing over State street are either slowing down for the stop or have not gained great momentum, and the dangers of a grade crossing are, of course, diminished accordingly. The Harvey eating house would obstruct the view, to some extent, of a traveler approaching the railroad tracks from the north on State street.

"XVI. I find that for every purpose of traffic the Congress street subway serves every one wishing to go from a point east of Congress street and south of the tracks to any point in the city, and from any point

in the city to any point south of the tracks and east of Congress street, as well as the proposed State street subway could do. There should be excepted from this finding parties going to or from one block between Third and Fourth avenues on State street. The east side of State street between Third and Fourth avenues is a public park; on the other side of the street are five residences.

"XVII. I find that for every purpose of traffic the Neosho street crossing serves any one wishing to go from any point west of Neosho street and south of the railroad to any point in the city, and from any point in the city to any point west of Neosho street and south of the railroad, as well as the proposed subway at State street, excepting for the difference between a subway and a grade crossing. (The same exception as noted in finding XVI should be made here.)

"XVIII. There are 319 houses in the section of Emporia south of the tracks and west of Congress street which would be served by this subway on any traffic which carried them to points north of the tracks and west of Congress street. Of this number all but fifty-two could be served for every purpose by the Neosho street crossing and other crossings west of there, excepting for the difference between a grade crossing and a subway crossing. (The same exception as noted in finding XVI should be made here.)

"XIX. These fifty-two houses south of the tracks, on traffic carrying them to points on State street north of the tracks and traffic coming from points on State street north of the tracks to these fifty-two houses on State street south of the tracks, would be served by the proposed subway, and without it would be required on such journeys to make a detour of one block either to Neosho street or Congress street.

"XX. Persons wishing to go from the first block north of the tracks to the first block south of the tracks on State street, in the absence of this crossing, must make a detour of one block east or west, and from a point on State street either to Second or Fourth avenue.

"But one of the present residents on these two blocks owns a vehicle of any kind. Allowing for the park, there are twenty-one fifty-foot lots in these two blocks, upon which are now located twelve houses. Attached hereto is a census of these two blocks. Owing to the

deep excavation necessary to carry this street under the embankment it is physically impossible to get teams or vehicles of any kind from seven out of twelve of these houses down to State street; and it may be added, it would likewise be impossible for these seven houses to reach State street if a grade crossing was established, owing to the fill necessary. Prior to the work done by the city in 1913 these lots were all accessible to the street.

"On the east side of State street south of the tracks is a concrete storm sewer 5½ feet square lying at the surface of the ground, which effectually bars any ingress or egress from State street to five out of seven of the lots on that block.

"The result is that there are but five families in these two blocks who would be peculiarly benefited by the subway and who could make use of this street for the purpose of getting vehicles or teams in or out of their properties.

"XXI. A serviceable grade crossing could be constructed by the defendant, allowing five per cent grade, but not paving the approaches, at this time for $2,837.20. Prior to the excavation made by the city in 1913, this crossing could have been put in for $2,151.40. A grade crossing would put the adjoining lots just about the same distance below grade as the subway would put them above grade, and as far as access to their premises and the problems of drainage and the steepness of the incline are concerned the situation is not materially different. The adjoining properties, which would be below grade, probably are more seriously affected, from æsthetic considerations, than the same lots the same distance above grade.

"XXII. That part of Emporia lying south of the tracks has grown very little, if any, in the last ten or fifteen years. The section is devoted to the homes of laboring people of the city, many of whom are employees of the defendant. The main part of the city, both as to residence and business, is north of the tracks. The business section is east of Congress street, and half or more of the residences are east of Congress street. There are some scattering business houses south of the track, one grocery store which does considerable business, and several smaller businesses. There are two schoolhouses south of the tracks, one of them being two blocks directly south on Congress street, which are

completely cared for by the Congress street subway; a four-room school several blocks west of State street, which would be cared for by the Neosho street crossing as far as a grade crossing can do, and by the Congress street subway on all errands to the business section of the city, or any point east of Congress street.

"XXIII. The cost of the proposed construction to the defendant would lay between twenty and twenty-five thousand dollars.

"XXIV. I find no evidence of any conspiracy upon the part of the city officials, nor any evidence of fraud or corruption, nor evidence that they were actuated by any ulterior motive.

"XXV. In 1897, or in 1898, there were negotiations between the city and the defendant with reference to opening State and Congress streets. The defendant suggested the desirability of a subway at State street, but the suggestion was accompanied or followed by statement with reference to blocking Neosho street. For some reason nothing came of these negotiations. Shortly prior to the action of the city compelling a subway at Congress street, the negotiations were re-opened. The defendant offered to construct a subway at State street or midway between the two, which the defendant contended, and it seems with good reason, was the proper place for a subway if only one were to be constructed. The defendant, however, denied the right of the plaintiff to compel a subway at both of these streets. These negotiations were in progress when the city commenced its action to compel the construction of the Congress street subway.

"XXVI. There is evidence to the effect that it is a custom among engineers when running grades to run such grades to the high point in a street; the city engineer of Emporia suggests that in his opinion this may account for the establishment of the grade in 1889 at the top of the defendant's embankment. This was, frankly, simply the opinion of the engineer, and I am unable to find such to be the fact, because it seems to me quite as probable that that line was established because it may have been conformatory to the grade established in pursuance of the ordinance of 1870; or if such a grade was not established in 1870 the city may have intended to confirm the action of the defendant in laying its tracks where it did; in any event,

I do not find that the grade of 1889 was established solely by reason of a custom among engineers.

"XXVII. The main line of the defendant company from Chicago to Los Angeles, which carries interstate commerce, runs across the intersection at State street and Third avenue.

### "CONCLUSION OF FACT.

"From the above facts I conclude that the action of the city council in ordering in the subway under consideration is not without any support in reason, and is, therefore, a valid exercise of legislative power.

### "CONCLUSION OF LAW.

"That the writ as prayed for should issue.

### "MEMORANDUM.

"The decision of this case, in my opinion, turns entirely upon the question of fact which is found in the conclusion made by the commissioner. Not knowing exactly what weight this conclusion will carry with this court, or any other tribunal, it has seemed fair to me to amplify more than is proper in a finding of fact the situation as it appears to the commissioner after hearing the decisions, and after several personal examinations of the vicinity directly affected by this proposed improvement; hence this memorandum, which is prepared, as far as the facts are concerned, with the same care as the findings and conclusions of fact.

"There is little doubt in my mind of the absolute right of the city to compel the defendant to provide some means of crossing their tracks upon a regularly laidout street. I think this right exists without an ordinance, and even without a statute. The question is whether a situation exists under all the circumstances which enables the city in the exercise of its undoubted legislative power to compel a subway costing some twenty odd thousand dollars rather than a grade crossing which can be established for a comparatively small sum.

"In this connection it should not be overlooked that the defendant under contract laid its tracks upon a grade fixed by the city engineer. That in 1889 the grade of the cross street, State street, was established, or at least confirmed, at the top of the embankment.

"Upon the faith of these ordinances the defendant has expended considerable sums of money. A change

of grade is made by the city after the improvements have been made which compels a subway if the street is opened on the grade as changed.

"It is contended by the city that the defendant company is estopped by its failure to appear in response to a proper notice and ask the council to allow it damages on account of this change in grade; that having failed to pursue its remedy before the administrative board provided, its right to recourse in the courts is lost. It seems to me that the defendant could not have established damages before the appraisers or before the board, by reason of the fact that at that time the city had not ordered State street opened and there was no certainty of damages resulting to them by reason of the change. If there was no possibility of remedy before that board, certainly the defendant is not estopped.

"There is a statute which provides that cities of the second class may order subways or overhead crossings whenever its legislative body thinks it necessary. This is probably a codified expression of a power existing at common law, and should be subject to the same limitations, to wit, that there should be some reason in the circumstances surrounding which will afford a constitutional support for such action.

"This brings us to the merits of the case: Here again the law is as well settled, I think, as a law can be which needs for its application a rule of reason. Circumstances may well be imagined which would make the construction of a subway not only reasonable, but a plain duty which a city council owes to humanity. Such, for example, would be the ordering in of an under or overhead crossing at a principal thoroughfare in a great city. It is likewise not difficult to imagine circumstances under which such action would be plainly confiscatory and unconstitutional. For example, a branch line of the Missouri Pacific railway wanders through the city of Winfield from the southeast corner of town to the northeast corner of town. It crosses more than thirty streets of that city, a city of the second class. It operates two trains a day through that city at a speed which admits of stopping within the length of the engine. If the city council of Winfield, acting from the purest of motives, should order that company to construct a subway at each of

47—94 KAN.

those crossings, it is not conceivable that any court would sustain such action. Each case must be governed by its own circumstances, and to determine where these varying conditions mark the present state of law is difficult. It is conceded by all that it is not the province of the courts or of a commissioner of such courts to substitute their judgment for that of a legislative body charged with that specific duty. The duty of the courts is ended when it has been determined that such reasonable ground may be found for the exercise of power used.

"A careful scrutiny into the circumstances surrounding the situation presented by this record, and of the vicinity affected, has left the commissioner, after much deliberation, very much in doubt as to the correctness of his conclusion of fact. I have been much impressed by the fact, as far as the purpose of traffic is concerned, that there is very little demand for this improvement. Another subway has been constructed within a stone's throw. There is but a small part of the town south of the tracks. It is the residence part of a distinct class of people, whose employment generally is found upon the same side of the tracks. Probably the principal communication between the two parts are deliverymen going from the business part of the town and the residents of that part of the town going to the business part of the town. Practically all of these could be served entirely by the Congress street subway. Farmers going to town can use the present subway with equal facility as the one proposed. If the reasons were confined to traffic and its demands I should have little hesitancy in holding that a grade crossing would so nearly completely answer all purposes that an action compelling a subway would be confiscatory.

"Some crossing, however, is necessary, and the cost of a grade crossing must be likewise considered in determining the reasonableness of a subway, together with the possible future calls upon it. If a grade crossing were established, it would find some use. Persons using it would be subjected to the danger attendant upon grade crossings, diminished somewhat on account of the low rate of speed used at that point, but still attended with some danger. The tendency of the times is to do away with grade crossings. And although I am impressed with the idea that the present need for

such a crossing is slight, and that if the city had been spending its own money instead of the defendant's it would have been much slower to act under the circumstances, yet I am unable to say their action was so entirely without reason as to amount to an abuse of power.                           ————————, *Commissioner.*"

JOHNSTON, C. J. (dissenting) : In my opinion the ordinance is valid and should be enforced.

In the control of the streets the power of the legislature is supreme and unlimited except so far as it is restricted by constitutional limitations. The legislature may exercise the power directly or through the municipal authorities, and when the power is delegated to the mayor and commissioners, as in this instance, that body has the same plenary power and full discretion that the legislature itself has and may exercise. Here the power to direct the making of an under-grade crossing was expressly conferred on the mayor and commissioners. It was not a mere general power to require the maintenance of crossings, but they were given the distinct authority to require specified kinds of crossings, that is, either a viaduct over or a tunnel under the streets. (Laws 1913, ch. 106.) The commission was authorized to require such a crossing whenever it deemed it to be necessary for the convenience, safety or protection of the public. The determination of the necessity, that is, the kind of crossing that will best subserve the public welfare, is purely a matter of legislative discretion with which the courts can not interfere. (*City of Emporia v. Railway Co.,* 88 Kan. 611, 129 Pac. 161; *State v. Union P. R. Co.,* 94 Neb. 556, 143 N. W. 918; *Wabash Railroad Company v. Defiance,* 167 U. S. 88, 17 Sup. Ct. Rep. 748, 42 L. Ed. 87; *American Tobacco Co. v. St. Louis,* 247 Mo. 374, 431, 157 S. W. 502; *Swift v. Delaware, L. & W. R. R. Co.,* 66 N. J. Eq. 34, 57 Atl. 456; 1 Dillon on Municipal Corporations, 5th ed., § 243; 2 Elliott on Roads and Streets, 3d ed., § 956.) The expediency, policy or wisdom of the

action taken by the mayor and commissioners within the statutory authority conferred is no more reviewable by the courts than would be the decision of the legislature if it had directly provided for the undergrade crossing in question. The legislature sometimes makes requirements of municipalities and individuals as to highways, parks and public grounds which may seem to members of the judiciary to be unreasonable, unnecessary and even absurd, but where the requirements do not transcend constitutional limitations the court can not repeal them nor substitute its own judgment as to what is the wisest and best policy. No more can the courts sit in judgment on the decision of the mayor and commissioners as to whether an undergrade, overhead or grade crossing was the best adapted to the needs and protection of the public at the State street crossing. The municipal authorities were vested with authority to decide that question, and it is not within the province of the court to inquire into the wisdom or policy of their action, nor yet into the motives that actuated them. In *Burlingame v. Thompson,* 74 Kan. 393, 86 Pac. 449, it was said:

"It requires no argument and no reference to precedent to show that this court can not sit in judgment upon the motives actuating the municipal authorities in pursuing a course which the legislature expressly authorized them to take." (p. 394; *City of Wichita v. Burleigh,* 36 Kan. 34, 12 Pac. 332; *McCray v. United States,* 195 U. S. 27, 24 Sup. Ct. Rep. 769, 49 L. Ed. 78.)

The power being expressly conferred on the mayor and commissioners and its exercise not being inconsistent with any constitutional or statutory provision, the ordinance should be upheld unless it is manifest that the municipal authorities acted in bad faith, and to nullify their action on that ground it must be so flagrant and fraudulent that it can not be regarded as in any sense an exercise of legislative power. The facts in this case were not such as to convict the municipal authorities of fraud or bad faith. One of the

principal streets of the city was blocked by four tracks of the railroad company. The main line of the defendant passes through Emporia and over State street, and two branch lines of the company unite with the main line at this station, and consequently a great number of passenger and freight trains pass over the street. The crossing is only one block from the passenger station, and necessarily the trains which stop at the station greatly obstruct the use of the street much of the time. The crossing is only three blocks from the entrance to the freight yards, and it is easy to see that there is great inconvenience and peril in a grade crossing at this place. Considerable is said about agreements having been made to build an undergrade crossing or such an one as the city authorities should direct, but in addition and apart from any agreement or any obligation resulting from the acceptance of prior ordinances it was the duty of the railroad company, when it built its tracks across this street, to restore it and make a safe and substantial crossing over it. That duty is a continuing one which has rested upon the company from the beginning, and the fact that there are crossings east and west of the street that afford a passage to the south does not relieve the defendant from making and maintaining a suitable and sufficient crossing on this street. A crossing of some kind was required. It devolved on the mayor and commissioners to determine its character, and in their legislative discretion they decided that the convenience and safety of the public required an undergrade crossing. In view of the conditions existing at the crossing, it can not be said that the decision of the commission is not an exercise of the legislative discretion vested in them. To set aside the ordinance is to convict the officers of bad faith and fraud, and in my view the facts in the case do not warrant such a conclusion.

I think the decision of the commissioner appointed by this court, to the effect that there were reasonable grounds for the passage of the ordinance, should be approved and the ordinance upheld.