CHICAGO, M. & ST. P. RY. CO. v. CITY OF MINNEAPOLIS et al. (MINNEAPOLIS STEEL & MACHINERY CO. et al., Interveners.)

(District Court, D. Minnesota, Fourth Division. August 15, 1916.)

1. RAILROADS ⟨⟩99(2)—ABOLITION OF GRADE CROSSINGS—ORDINANCE—CONSTRUCTION.

A municipal ordinance to compel a railway company to depress its tracks to avoid crossing streets, at grade in the manner thereinafter set forth, followed by provisions requiring the streets and avenues to be carried across the tracks by bridges constructed in accordance with the plans and specifications of the city engineer, fixing the width and grades of the bridges, requiring the sewers, water pipes, and similar structures to be removed and restored under the approval of the city engineer, which ordinance was adopted after the city engineer, acting under an earlier resolution of the council, had prepared complete plans for the depression, according to which the tracks were to be 17 feet below their present level, does not permit the tracks to be depressed to a lower level, though the level of the tracks is not mentioned in the text of the ordinance.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 294; Dec. Dig. ⟨⟩99(2).]

2. RAILROADS ⟨⟩99(2)—CONSTRUCTION—STATUTE.

Laws 1913, Minn. c. 307 (Gen. St. 1913, §§ 4272–4280), prohibits a railroad company from constructing any overhead structures across its tracks at a less height than 21 feet above the top of the rail. It was amended by Laws 1913, c. 448 (Gen. St. 1913, § 4277), by adding a proviso excepting from its operation the depression of the tracks of a railway company on which work had theretofore begun. Held, that the statute, but not the proviso, applied to the depression of railroad tracks ordered by a municipal ordinance, though on another part of the line of the same company within the city, not affected by the ordinance, the work of depressing the tracks had already begun under a separate and different plan.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 294; Dec. Dig. ⟨⟩99(2).]

3. RAILROADS ⟨⟩99(2)—ABOLITION OF GRADE CROSSINGS—ORDINANCE—EVIDENCE.

In a suit to restrain the enforcement of a municipal ordinance requiring a railway to depress its tracks under plans which called for only 18

⟨⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

feet clearance between the rails and the bridges above, evidence *held* clearly to show that such clearance is insufficient and unsafe in view of the size of freight cars now in common use.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 294; Dec. Dig. ☜99(2).]

**4. RAILROADS ☜99(1)—ABOLITION OF GRADE CROSSINGS—ORDINANCE—VALIDITY.**

A municipal ordinance, requiring the lowering of railway tracks to avoid grade crossings, though within the city's police power, is open to inquiry as to its necessity or reasonableness to determine whether its enforcement will deprive parties of their property without due process of law.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 293; Dec. Dig. ☜99(1).]

**5. RAILROADS ☜99(1)—ABOLITION OF GRADE CROSSINGS—ORDINANCES—PRESUMPTION.**

The presumption is in favor of a municipal ordinance, requiring the lowering of railway tracks to avoid grade crossings, and if that is the only method to accomplish the result, it cannot be adjudged unnecessary, unreasonable, or arbitrary, except under most unusual circumstances.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 293; Dec. Dig. ☜99(1).]

**6. RAILROADS ☜99(2)—ABOLITION OF GRADE CROSSINGS—ORDINANCE—EVIDENCE—ALTERNATIVE PLAN.**

In a suit to restrain the enforcement of an ordinance requiring the lowering of railway tracks to avoid grade crossings, plaintiff can show that there is another feasible plan to accomplish the result.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 294; Dec. Dig. ☜99(2).]

**7. RAILROADS ☜99(1)—ABOLITION OF GRADE CROSSINGS—ORDINANCE—SUITS—PARTIES.**

Owners of industries along the line of a railway which have spur tracks connected therewith, whether they have vested rights in such facilities or not, are entitled to be heard on the question of the reasonableness of an ordinance requiring the depression of the railway.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 293; Dec. Dig. ☜99(1).]

**8. CONSTITUTIONAL LAW ☜297—DUE PROCESS OF LAW—ABOLITION OF GRADE CROSSINGS—ORDINANCE.**

In a suit to restrain the enforcement of a municipal ordinance compelling the depression of railway tracks, evidence *held* to show that the provision, requiring the depression of the tracks a second time after they had reached the natural level at the railroad yards, in order to pass under one street, was unnecessary, unreasonable, and arbitrary to such an extent as to deprive the railroad company and an industrial plant having trackage connections therewith of their property without due process of law.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 832–834; Dec. Dig. ☜297.]

**9. MUNICIPAL CORPORATIONS ☜111(4)—ORDINANCES—PARTIAL INVALIDITY.**

That provision of the ordinance cannot be held separable from the rest of it, so that its invalidity would not affect the provisions for depressing the tracks before reaching the yards, where the proceedings in the council, show that the invalid provisions were treated as part of the general scheme.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 248–251; Dec. Dig. ☜111(4).]

---

☜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

10. MUNICIPAL CORPORATIONS ⊕⟶111(4)—STATUTES ⊕⟶64(1)—ORDINANCES—
PARTIAL INVALIDITY.
A statute or ordinance can be held valid in part and invalid in part
only when the legislative body has manifested an intention to deal with
a part of the subject-matter irrespective of the rest.
[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§
248–251; Dec. Dig. ⊕⟶111(4); Statutes, Cent. Dig. §§ 58, 195; Dec. Dig.
⊕⟶64(1).]

11. MUNICIPAL CORPORATIONS ⊕⟶594(1)—POLICE POWER—SCOPE.
The police power can be exercised for the safety, health, morals, con-
venience, or general prosperity of the public, but an ordinance exercis-
ing such power must have some relation to one or more of such objects,
must not conflict with the state or federal Constitution, nor with state
or federal statutes, and must not arbitrarily, unnecessarily, or unreason-
ably invade private rights or property.
[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §
1316; Dec. Dig. ⊕⟶594(1).]

12. RAILROADS ⊕⟶99(1)—ABOLITION OF GRADE CROSSINGS—ORDINANCE—REA-
SONABLENESS—EVIDENCE.
In a suit to restrain the enforcement of an ordinance requiring the
lowering of railway tracks, evidence *held* to show that the ordinance un-
necessarily and unreasonably imperiled the safety of the railway em-
ployés, and imposed unreasonable expense upon the railway company, and
other companies having trackage connections, amounting to a practical
confiscation of their property in view of the possibility of accomplishing
the same result by elevating the tracks.
[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 293; Dec. Dig.
⊕⟶99(1).]

In Equity. Suit by the Chicago, Milwaukee & St. Paul Railway Com-
pany against the City of Minneapolis and others, to restrain the en-
forcement of a municipal ordinance which required the railway com-
pany to depress its tracks, in which the Minneapolis Steel & Machinery
Company and others intervened. On final hearing. Permanent in-
junction against the enforcement of the ordinance issued.

F. W. Root, Nelson J. Wilcox, and W. H. Norris, all of Minneapolis,
Minn., for complainant.

Charles D. Gould, W. H. Morse, and Rome G. Brown, all of Minne-
apolis, Minn., for defendants.

Stringer & Seymour, of St. Paul, Minn., for Chicago, R. I. & P.
Ry. Co.

Lancaster, Simpson & Purdy and Cobb, Wheelwright & Dille, all of
Minneapolis, Minn., for interveners.

BOOTH, District Judge. This is a suit brought by the plaintiff
railway company against the city and certain of its officers, for a per-
manent injunction to restrain the defendants from taking any steps to
enforce the provisions of an ordinance passed by the city council of
said city, requiring the railway company to depress the plane of certain
of its roadbed and tracks between Sixth Avenue South, and Thirty-
Second Street East, in the city of Minneapolis, in accordance with the
terms of said ordinance, and certain plans and specifications prepared

⊕⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

by the city engineer. A motion to dismiss, on the ground that the court was without jurisdiction, has been heard and denied. A motion to dismiss, on the grounds that the complaint fails to state a cause of action, and, further, that the plaintiff has an adequate remedy at law, has also been heard and denied. By petitions duly filed, more than 20 parties, being owners of industries located along the right of way of the plaintiff, and also the Chicago, Rock Island & Pacific Railway Company, whose terminals are adjacent to the tracks of plaintiff company, and are reached over the tracks of the plaintiff company by virtue of contract between the two companies, have sought to intervene, claiming to have an interest in the controversy; they have been allowed to file intervening complaints and take part in the trial of said cause. A motion for a preliminary injunction was heard upon the pleadings and numerous affidavits; and an order has been made granting the motion. Voluminous testimony has been taken on behalf of the various parties, and the cause has been submitted upon final hearing.

The ordinance involved in the controversy is as follows:

An ordinance requiring the Chicago, Milwaukee & St. Paul Railway Company to depress the plane of certain of its roadbed and tracks within the city of Minneapolis, and construct an undercrossing at Sixth Avenue South in said city.

The city council of the city of Minneapolis do ordain as follows:

Section 1. The Chicago, Milwaukee & St. Paul Railway Company is hereby ordered and required at its sole cost and expense, except as herein otherwise provided, to depress the plane of its roadbed and tracks along the main line, and part of the line of the Iowa and Minnesota Division, so-called, within the limits, and in the form and manner, and upon the terms and conditions hereinafter set forth, that is to say: Beginning at the east line of Sixth Avenue South in the city of Minneapolis, and extending southeasterly to Thirty-Second Street East, in said city.

Sec. 2. The following streets and avenues now crossing said railroad within said limits shall be carried by said company over the tracks of said railroad upon bridges of steel or reinforced concrete construction, in accordance with plans and specifications prepared by the city engineer of said city.

Sec. 3. The roadway of every bridge included within this ordinance shall be paved by said company for the entire length thereof, with 4-inches thick creosoted block pavement, and shall have a sidewalk upon either side thereof, constructed of reinforced concrete.

Sec. 4. The width of the roadway and sidewalks of the several bridges and the street grades of same, as well as other new grades of the various streets affected by the construction of said bridges—shall be as follows:

### Schedule of Bridges.

### Washington Avenue South.

Width of roadway, 64 feet.
Width of each sidewalk, 18 feet.

The street elevation of Washington Avenue South at center line of said avenue in center of block between 6th and 7th avenues shall be 115.25 feet above city datum; northwest corner of bridge at intersection of curb line and railway right of way line shall be 131.20 feet above city datum; northeast corner of bridge at intersection of curb line and railway right of way line shall be 130.35 feet above city datum; southwest corner of bridge at intersection of curb line and railway right of way line shall be 130.35 feet above city datum; southeast corner of bridge at intersection of curb line and railway right of way shall be 129.81 feet above city datum; center line of Tenth Avenue South shall be 121.00 feet above city datum.

The grade of the approach from the bridge will extend to the center of block between Sixth and Seventh Avenues South to the present grade, and to present grade of Tenth Avenue South.

### Seventh Avenue South.

The grade of Seventh Avenue South shall be on an unbroken plane, from present grade 117.00 feet above city datum at a point halfway between Washington avenue and Third street, to new grade of Washington avenue at intersection with Seventh Avenue South.

### Eighth Avenue South.

The grade of Eighth Avenue South shall be on an unbroken plane from elevation 116.00 feet above city datum at a point 250 feet southwesterly of center line of Washington avenue to new grade of Washington avenue at intersection with Eighth Avenue South.

### Ninth Avenue South.

Width of roadway, 50 feet.
Width of each sidewalk, 15 feet.
The grade of Ninth Avenue South shall be on an unbroken plane from Washington avenue to intersection of center line of Ninth Avenue South and northeasterly railway right of way line at an elevation of 127.55 feet above city datum; center line of Ninth Avenue South and center line of railway right of way at an elevation of 128.05 feet above city datum; center line of Ninth Avenue South and southwesterly railway right of way line at an elevation of 127.55 feet above city datum; center line of Ninth Avenue South and Third street at an elevation of 124.00 feet above city datum; center line of Ninth Avenue South and a point 175 feet southwesterly of center line of Third street, 124.90 feet above city datum.

(Here follow similar provisions with reference to the following streets and avenues.)

Third Street South, Tenth Avenue South, Eleventh Avenue South, Fourth Street South, Twelfth Avenue South, Fifth Street South, Thirteenth Avenue South, Fourteenth Avenue South, Sixth Street South, Fifteenth Avenue South, Seventh Street South, Sixteenth Avenue South, Seventeenth Avenue South, Eighth Street South, Cedar avenue, Franklin avenue, East Twenty-Second street and East Twenty-Fourth street.

### East Lake Street.

Width of roadway, 50 feet.
Width of each sidewalk, 15 feet.
The street elevation at center line of East Lake street and Hiawatha avenue shall be 131.00 feet above city datum; center line of East Lake street and southwesterly railway right of way line shall be 134.40 feet above city datum; center line of East Lake street and center line of railway right of way shall be 134.90 feet above city datum; center line of East Lake Street and northeasterly railway right of way line shall be 134.40 feet above city datum; center line of East Lake street and Snelling avenue shall be 128.00 feet above city datum.

Sec. 5. The grades of the several streets and avenues upon which bridges shall be constructed as aforesaid, and the grades of the several streets and avenues in which the approaches to any of said bridges shall be constructed, shall be and the same are hereby changed so as to conform to the several grades in the schedule of bridges herein set forth.

Sec. 6. The approaches to bridges shall conform to the grades established by this ordinance and shall be in all other respects restored by said company as near as may be to the condition theretofore existing, including the pavement thereon.

Sec. 7. The grade of Twenty-Eighth Street East shall be and the same is hereby changed so that the elevation of the street at the center of intersection of said street with the railroad shall not exceed 4.2 feet below the present grade thereof, and shall not exceed 127.2 feet above city datum; and the railroad tracks of said railway company shall cross said street at grade.

Sec. 8. The grade of Hiawatha avenue shall be and the same hereby is changed so that the elevation of the same at the center of intersection of said avenue with the railroad shall not exceed 7.7 feet below the present grade thereof, and shall not exceed 122.8 feet above city datum; and the railroad tracks of said railway company shall cross said avenue at grade.

Sec. 9. It is expressly provided, anything in this ordinance to the contrary notwithstanding, that the said railway company shall not be required to restore any part of the paving on or to pave any part of such bridges which, by reason of any existing law or ordinance, it is or will be the duty of any street railway company itself to restore or pave.

Sec. 10. Any street railway company occupying any street or avenue included within this ordinance, shall, whenever by said railway company required, remove temporarily its tracks therefrom, and shall, when and as the grade of such street or avenue shall be changed, as in this ordinance provided, at its own expense, without claim for damages, conform the grade of its track or tracks to the said change of grade of said street or avenue, both during and after the bridging of said street or avenue, and nothing in this ordinance shall operate or be held to relieve such street railway company from any liability now existing, however created of paving such street or avenue between or on either side of the rails of its said tracks, in the manner and form as now required.

Sec. 11. All water pipe, conduits, sewers and other similar substructures belonging to the city that may be disturbed in the prosecution of such work or required to be removed or deflected from the position in which they are found shall be replaced or suitable expedients be devised and provided by said railway company, under the approval of the city engineer, to restore them as fully as may be to their former state of usefulness.

Sec. 12. Whenever, in the prosecution of any of the work required by this ordinance, it becomes necessary to disturb, remove or protect any pipes, conduits, wires or other property belonging to any private corporation or individual, all the work or expense required therein or therefor, as well as all damage occasioned thereby, shall be done or assumed by the owner or owners of such pipes, conduits, wires or other property, and said railway company shall be and hereby is wholly relieved from doing any work, or assuming any expense in connection therewith or paying any damage occasioned thereby.

Sec. 13. The said railway company shall assume and pay any and all damages to which the adjacent property owner may be lawfully entitled, caused by the change of the grade of any such street or avenue; and shall defend any suit or suits which may be brought against the city of Minneapolis for the recovery of any such damages, intervening therein if necessary for such purpose, and shall wholly relieve said city from defending the same, and shall assume and pay all judgments recovered therein.

Provided that in case any such suit be brought against said city it will, before the last day to plead therein, give notice thereof in writing to the said railway company, for the purpose of enabling such defense to be made by said railway company; and, in default of such notice, the said railway company shall not be held liable for any alleged damages.

Sec. 14. The said railway company shall build and maintain a suitable fence, to be approved by the city engineer, upon and along the entire right of way of said railway company when the tracks have been depressed.

Sec. 15. The said railway company shall also carry its tracks where the same cross Twenty-Seventh Avenue South, over said avenue, on a steel or reinforced concrete bridge, in accordance with plans and specifications prepared by the city engineer of said city.

The elevation of Twenty-Seventh Avenue South at the intersection of said avenue with the north line of East Twenty-Seventh street shall be 117 feet above city datum, and at a point 64 feet south of said north line the elevation of said avenue shall be 116.5 feet above city datum, and the elevation of said avenue at the southerly railway right of way shall be 117 feet above city datum. A free clearance between said grade at Twenty-Seventh avenue and the railway bridge shall be not less than 14 feet. The approaches to said under crossing on Twenty-Seventh avenue, from the north line of East Twen-

ty-Seventh street and from the southerly railway right of way line, shall extend on an ascending grade not to exceed 3 feet in 100 feet to an intersection with the present surface of the avenue.

Sec. 16. Permission and authority are hereby given said railway company, whenever the same shall be necessary in the prosecution of the work herein required, to lay and operate temporary tracks upon or across any street or avenue mentioned in this ordinance, and to erect and maintain temporary structures and falseworks therein, and to obstruct or divert traffic from any such street or avenue to such an extent and for such length of time as may be approved by the city engineer. But said railway company shall thereafter restore every such street or avenue as near as may be to its former condition.

Sec. 17. Permission and authority are hereby given said railway company, for the purpose of carrying off the surface or flood waters from its property, to make and maintain connections with all city sewers. The same to be made under the supervision of the city engineer.

Sec. 18. Said Chicago, Milwaukee & St. Paul Railway Company is also hereby directed and required, at its sole cost and expense, to separate the grade of its railway lines, tracks and yards at Sixth Avenue South, in the City of Minneapolis from the grade of said Sixth Avenue South at its intersection with said railway lines, tracks and yards of said company, and for that purpose to make, build and construct an undercrossing or viaduct under its said railway lines, tracks and yards at their intersection with said Sixth Avenue South, upon and along the middle 22 feet in width of said Sixth Avenue South, and extending from Third Street South, in said city, northeasterly to the canal between Second street and the Mississippi river in said city, all in strict conformity with the plans and specifications for such undercrossing or viaduct prepared by and on file in the office of the city engineer of the city of Minneapolis.

For the purpose of constructing said undercrossing or viaduct the grade of the middle 22 feet in width of said Sixth Avenue South at said location is hereby established as follows, to wit:

At the intersection of the center line of Sixth Avenue South with the northeasterly curb line of Third Street South, 117.50 feet above city datum; at the intersection of the center line of Sixth Avenue South with the southwesterly curb line of Washington Avenue South, 100.50 feet above city datum; at the intersection of the center line of Sixth Avenue South with the southeasterly side line of Washington Avenue South, 99.40 feet above city datum; at the intersection of the center line of Sixth Avenue South with the northeasterly curb line of Second Street South, 95 feet above city datum; and at the intersection of the center line of Sixth Avenue South with the southwesterly side line of the canal between Second street and the Mississippi river, 90.72 feet above city datum; and the grade of said middle 22 feet in width of Sixth Avenue South shall be an unbroken plane between the several grade elevation points above established.

Sec. 19. When the said railway companies shall have completed the work required by this ordinance, then and thereupon the several ordinances of the city of Minneapolis relating to the speed of railway trains, cars and engines, the ringing of locomotive bells, and the maintenance of gates and flagmen, watchmen, shall cease to be applicable to any part of said line of railroad between said Sixth Avenue South and said Thirty-Second Street East, save only at said Twenty-Eighth Street East and said Hiawatha Avenue South.

Sec. 20. The work required to be done under this ordinance shall be begun within nine months after publication thereof, and shall be completed within four years thereafter, except that the time during which said railway company shall be prevented from work by strike or strikes, and the time during which they shall be restrained by injunction or other order or process of a court of competent jurisdiction, of which it shall have given notice to the city attorney of the city of Minneapolis, and the time during which the work shall be delayed in consequence of the failure of any street railway company or corporation to pave any part of any such bridge required to be by it paved, or by this ordinance required by it to be performed, shall be added to the date herein fixed for the completion of said work.

And it is further provided that if said railway company shall be delayed in the prosecution of the said work required to be done under the provision of this ordinance by reason of the failure of any private corporation or individual to comply with any requirement mentioned in section 12 of this ordinance, or by reason of any delay on the part of the city of Minneapolis or any of its officers, in performing any of the duties imposed upon it or them by this ordinance, in respect to the work herein required to be done by said railway company, then and in that case the time which said railway company shall be so delayed, as well as the time which said railway company shall be delayed by causes beyond its control, shall be added to the time during which said railway company is required by the terms of this ordinance to complete said work.

Sec. 21. This ordinance shall take effect and be in force from and after its publication.

Passed Sept. 12th, 1913.

Karl De Laittre, President of the Council.

Approved Sept. 18th, 1913.

W. G. Nye, Mayor.

Attest:

Henry N. Knott, City Clerk.

The ultimate question in the suit is whether a permanent injunction shall issue against the enforcement of the ordinance. Since the decision of the Supreme Court of the state of Minnesota in the case of Twin City Separator Co. v. Chicago, Milwaukee & St. Paul Railway Co., 118 Minn. 491, 137 N. W. 193, there can no longer be doubt that the city of Minneapolis has the power to pass an ordinance providing for the separation of street and railway grades.

See, also, Missouri Pacific Railway v. Omaha, 235 U. S. 121, 35 Sup. Ct. 82, 59 L. Ed. 157, and cases there cited.

The necessity in this case for the separation of the street grade from the railway grade along plaintiff's line between the points above named is not in dispute, but is expressly admitted by the plaintiff and all other parties to the controversy.

The present ordinance, however, is attacked by the plaintiff and the interveners as being arbitrary and unreasonable, and as having the effect, if executed, of depriving the plaintiff and the interveners of their property without due process of the law. More specifically, it is claimed on the part of the plaintiff:

(1) That the subsoil along and adjacent to the track sought to be depressed is marshy, and in some places composed of quicksand, and that this condition makes it either impossible, or possible only at enormous expense, to maintain and operate the railway tracks depressed as required by said ordinance.

(2) That the depression of said tracks in accordance with the ordinance would result in a loss of one of the five tracks now located upon the right of way along the route of the proposed depression.

(3) That the depression of said tracks in accordance with the provisions of the ordinance would leave but 18 feet headroom or clearance between the tracks and the bridges over the streets and avenues, and that this clearance is insufficient for the safe and practical operation of the railway, and, furthermore, that it is contrary to the requirements of chapter 307 of the General Laws of Minnesota for 1913 (Gen. St. 1913, §§ 4272–4280), as amended by chapter 448 (Gen. St. 1913, § 4277) thereof.

(4) That the operations of the railway over the tracks affected are largely in the nature of switching operations, and would be seriously interfered with if 'the tracks were depressed in accordance with the ordinance, and the dangers accompanying operation largely increased, on account of the overhead and side structures, and on account of the frequent accumulation of smoke, steam, and gases in the depression, which would lessen 'the efficiency of signals, and hinder the carrying out of switching movements.

(5) That the proposed depression would necessitate extensive changes in the city sewers, water mains, conduits, and other underground structures, at a large and unnecessary expense.

(6) That the carrying out of the provisions of the ordinance would destroy or drive away many industries located along the railway between the points in question, and would prevent new industries from locating along said tracks, to the financial loss of the railway company, and that other industries would be put to enormous and unnecessary expense in adjusting themselves to the depressed tracks.

(7) It is also contended by the plaintiff that there is an alternative plan of separating the grades of the city streets from the grade of the railway tracks, namely, by elevating the railway tracks between the points in question; that this latter method would insure, equally with the depression plan, the great object sought in separating the grades, namely, the safety of the public; that it would avoid difficulties due to the character of the subsoil; that it would obviate the loss of one of the railway tracks; that it would not interfere with the sewers, conduits, and other underground structures; that the industries along the tracks could be more readily adjusted to the new conditions, and at much less expense; that the operation of the railway would be much less dangerous to the railway employés, by reason of the absence of overhead and side structures, and freedom from smoke, gases, etc.; that the resulting damages, if any, to abutting owners would be much less upon the elevated plan than upon the depression 'plan, and that the expense to the railway company upon the elevated plan would be less by upwards of $3,000,000 than upon the depression plan.

The interveners join with the plaintiff in these contentions.

The position of the city may be outlined as follows:

(1) The necessity of separating the grades being conceded, the choice of method lies with the city, and not with the railway company.

(2) That the character of the subsoil is not such as to render impracticable the depression plan.

(3) That the ordinance does not call for an 18-foot headroom, and that if the railway company desires more, it may depress the tracks still lower.

(4) That if the depression plan causes a loss of one of the present tracks of the railway company, additional right of way for replacing said track may be acquired by the railway company through condemnation proceedings.

(5) That industries along the right of way have no vested rights in their present railway facilities; that the expense of adjustment is no

concern of the city; and that if any of them cannot be provided with trackage facilities upon the depression plan, it is a deprivation incident to a necessary public improvement, and must be borne by the owners of the industries.

(6) That the safety and convenience of the general traveling public will be better served upon the depression plan than upon the suggested elevation plan, and that this is of importance paramount to the convenience of the railway company in the operation of its trains, or to the safety of its employés, if their safety would be lessened by the depression plan.

(7) That sightliness is an element to be taken into consideration, and that this makes largely in favor of the depression plan.

(8) That the question of expense, whether in connection with changing the sewers, adjusting the industries, or reconstructing the right of way and tracks, is one of little or no weight in determining the validity of the ordinance in question.

[1] The first question to be determined is, What does the ordinance provide? In other words, what demand is made by it upon the railway company?

The main point of dispute is as to the depth of the depression called for by the ordinance. On the part of the plaintiff it is contended that a 17-foot depression is provided for; on the part of the city, that no particular depth is specified, but that the railway company is at liberty, according to its necessity, to depress to any depth required. The text of the ordinance does not, in terms, provide for any specific depth of depression. Section 1 requires the railway company—

"to depress the plane of its roadbed and tracks * * * in the form and manner, and upon the terms and conditions hereinafter set forth, that is to say: Beginning at the east line of Sixth Avenue South in the city of Minneapolis, and extending southeasterly to Thirty-Second Street East, in said city."

"Sec. 2. The following streets and avenues now crossing said railway within said limits shall be carried by said company over the tracks of said railroad upon bridges of steel or reinforced concrete construction, in accordance with plans and specifications prepared by the city engineer of said city."

"Sec. 4. The width of the roadway and sidewalks of the several bridges and the street grades of the same, as well as other new grades of the various streets affected by the construction of said bridges, shall be as follows [Then follows a schedule of bridges]."

"Sec. 11. All water pipe, conduits, sewers, and other similar substructures belonging to the city that may be disturbed in the prosecution of such work or required to be removed or deflected from the position in which they are found shall be replaced or suitable expedients be devised and provided by said railway company, under the approval of the city engineer, to restore them as fully as may be to their former state of usefulness."

It thus appears that plans are specifically referred to in the ordinance, and that they are referred to for the purpose of indicating how the work is to be done. It is claimed by counsel for the city that these plans have reference to bridges only, and have nothing to do with the depth of the depression; that if the city engineer placed upon said plans figures and drawings showing the depth of depression, he did so without authority from the city council. A brief reference to

some of the steps taken at the time of the preparation and passage of the ordinance refutes these claims.

It is shown by the evidence that on March 14, 1913, a special committee on grade elimination, of the city council, recommended:

"That the city engineer be instructed to draw plans for the depression of the Chicago, Milwaukee & St. Paul main line to the feasible maximum depth, from the Milwaukee Depot to Twenty-Sixth street, and the city attorney be instructed to draw an ordinance to conform with said plans."

The words "Twenty-Sixth street" were stricken out by the city council, and the words "Twenty-Seventh avenue, including the I. & M. Division of the Milwaukee Railway to East Lake street," inserted in lieu thereof. Thereupon a resolution was adopted as follows:

"Moved that the city attorney and the city engineer be directed to prepare plans and ordinance and submit same within sixty (60) days to the city council, for lowering the tracks in accordance with the above report."

"Moved to amend said motion by adding at the end thereof the following: 'And that the city engineer be directed to furnish an estimate of the cost of depressing the tracks.'"

On July 11, 1913, the city engineer made his report (Exhibit C) in accordance with the foregoing resolution. In said report occurs the following language:

"According to your instructions to draw plans for the depression of the Chicago, Milwaukee & St. Paul Railway Company's main line, to the feasible maximum depth. * * * The depression has been commenced at the east line of Sixth Avenue South on an 0.8 per cent. rate of grade, till the depression reaches about 17 feet at Third Street South. This depression has then been practically maintained, to a little beyond Twenty-Second Street East. * * * From a point midway between Twenty-Seventh and Twenty-Eighth streets the tracks are again depressed on an 0.8 per cent. rate of grade, to reach a 17-foot depression at East Lake street." A clear headroom of 18 feet has been provided for, upon the advice of the city attorney; three feet has been assumed for the space occupied by the bridge floors." The estimated cost of the entire improvement, but without consideration of changes of industrial side tracks and damage to property, if any, is for track depression, complete with bridges, etc., $2,095,000. Cost of change of sewer system, $225,000. Cost of change of water pipe system, $25,000. Total cost, $2,345,000. All required data has been incorporated in an ordinance submitted by the city attorney and accompanying this report."

The plans referred to in the report, and accompanying the same, being Exhibits E1 and E2 were introduced in evidence. The legend upon Exhibit E1 contains the heading "Plan Showing Separation Grade." Upon the plan are shown, with figures given, "Old Elevation of Top of Rail," "New Elevation of Top of Rail," and "New Elevation of Bridge Floor."

It is contended by the city that the textual part of the ordinance would fit plans for a 21-foot depression as well as plans for a 17-foot depression. However this may be, it is clear from the evidence that the city council in passing the ordinance had in mind a 17-foot depression, which, in accordance with the plans, provided for an 18-foot headroom. The textual provisions of the ordinance and the plans, taken together, constituted the demand made by the city upon the railway company. That demand was for a 17-foot depression of the tracks and a raising of the streets at the crossings approximately 4

feet; the thickness of the bridge floors, being approximately 3 feet, would thus leave a headroom of 18 feet.

To hold now that the railway company is at liberty to depress its tracks 21 feet without further action on the part of the city council is to make in part a new ordinance. This is not permissible. The city council was evidently of the opinion that 18-foot headroom was sufficient. To secure this, it was willing to raise the grade of the streets at the crossing 4 feet. If an 18-foot headroom could be obtained by a 21-foot depression, leaving the grade of the streets at the crossings as they are now, it cannot be said with certainty that the city council would be willing that the grade of the streets should be raised 4 feet.

The rearrangement of the sewer system and other substructures was contemplated on a basis of a 17-foot depression. The plans show this, and the figures of estimated cost of rearrangement are on that basis. What action the city council might take if the railway company undertook to make a 21-foot depression, and rearrange the sewer system and other substructures upon that basis, cannot be foreseen. It is certain that the railway company in undertaking to do this would be acting outside of and contrary to the commands of the ordinance. The railway company could not legally demand from the city engineer plans for bridges, and for the rearrangement of the sewer system different from those already contemplated on the basis of a 17-foot depression. The railway company could not legally follow any plans except those furnished by the city engineer.

My conclusion upon this question, after considering all of the evidence bearing upon it, is that the plans are part of the ordinance, and that the ordinance, properly construed, calls for a 17-foot depression and an 18-foot headroom, and that the effect of the ordinance must be discussed upon that basis.

Placing this construction upon the ordinance, it becomes necessary next to examine the objections urged against its enforcement.

1. The question of the subsoil along the route between Sixth Avenue South and Thirty-Second Street East was gone into upon the trial to a very considerable extent. Evidence was given by experts upon behalf of the railway company and the city. Evidence and exhibits were also introduced, showing the results of experimental borings at various points along the route. It is not necessary to go into this evidence in detail. Upon consideration of the whole of it, I have reached the conclusion that the contention of the railway company cannot be sustained. The weight of evidence is clearly to the effect that the subsoil, while not of the best character for depression of tracks, nevertheless is not such as to render depression either impossible or impracticable, even though such depression be carried to a depth of several feet below the proposed 17 feet called for by the ordinance. The subsoil in some places is such as to render the work difficult and expensive, but not beyond the range of modern, practical engineering.

2. As to the loss of one track. It is conceded that the carrying out of the ordinance would result in the loss to the railway company of

one of its present five tracks. The evidence shows that this would be a severe loss. All of the present five tracks are in almost constant use, and it is doubtful whether even the present business of the railway company could be efficiently handled on four tracks only. It is true, as the city suggests, that the railway company could, by condemnation, acquire additional land for a fifth track. This, however, would necessitate the widening of the depression, the lengthening of the bridges over the railway tracks, and a negotiation with the city council for the purpose of obtaining its consent to the necessary changes, or litigation in the absence thereof. Additional right of way would, of course, entail additional expense.

[2] 3. As to the question of headroom, or clearance. According to the constructions above given to the ordinance, a headroom of only 18 feet is thereby provided, and the question arises as to the sufficiency of this headroom. By chapter 307, General Laws of Minnesota for 1913, a headroom of 21 feet from the top of the rail is demanded. But it is claimed by the city that the statute does not apply to the plaintiff railway company when read in connection with the amendment contained in chapter 448 of the Laws of 1913.

The statutes in question have not been construed by the Supreme Court of the state of Minnesota, touching the point here in question. If a construction had been placed upon them by that court, I should, of course, feel bound by that construction; but, in the absence of such decision, I must construe them in accordance with my best judgment.

In my opinion, the exception in the latter statute was intended to apply only to cases where a plan had already been made for depressing certain tracks; and the exception was inserted so as not to interfere with a plan already made and partly executed.

No plan was in existence at that time with reference to the present proposed depression of the tracks here in question. It is true that the plaintiff company had, on its Hastings & Dakota Division, already begun work on depressing the tracks, in accordance with plans agreed upon between the city and the company; but the tracks of the Hastings & Dakota Division were, and are, so far as the present problem is concerned, as separate from the tracks here in question as if owned by an entirely different railway company. No practical reason has been suggested why the plan for the Hastings & Dakota Division, separate and distinct as it was, should be controlling as to all other crossings of the plaintiff company in the city of Minneapolis, and exempt that company from the wise and humane provisions of the statute as to sufficient headroom at crossings.

I, therefore, give such construction to the statutes as best comports with safety to the lives and limbs of the railway employés, and hold that the exemptions in chapters 307 and 448 have no application to the tracks here in question, and that the plaintiff railway company is bound by chapter 307 to provide in the future 21-foot headroom, except as to those crossings included in plans in existence, and being carried out at the time of the passage of the statutes. A different construction would, in my opinion, be open to the serious objections of class legislation.

It would be a remarkable proceeding on the part of the state Legislature to exempt by statute the plaintiff railway company from constructing safe overhead clearances in the city of Minneapolis simply because the company had already adopted, as to certain crossings therein, a plan of clearance which the Legislature by its selfsame act declared insufficient.

The statute applies, and it calls for a 21-foot clearance; and an ordinance which calls for an 18-foot clearance is in plain conflict with the provisions of the statute, and cannot be enforced.

[3] But, quite apart from the statute, and merely as a matter of good railroading, an 18-foot clearance is insufficient and unsafe. The evidence clearly shows that many of the modern box cars are at least 15 feet in height above the rail. It is also in evidence that the present method of switching at times requires a man to take a position on top of the box cars for the purpose of controlling the cars, and also the giving of signals. It is true that evidence was introduced by the city to the effect that in some places signals were given by men stationed upon the ground. No convincing evidence, however, was introduced that this was feasible along the line in question, and under the conditions which would prevail in the proposed depression cut.

Furthermore, the evidence shows that a standard of 22-foot headroom has been adopted on more than 200,000 miles of railway in the United States, and 21-foot on more than 50,000 more. While this does not mean that all of the overhead crossings on these railroads have a clearance equal to the standard, yet the fact that the standard has been adopted is a strong reason for holding an 18-foot clearance insufficient and unsafe. It is true, as shown by testimony on the part of the city, that there are many overhead crossings in the city of Minneapolis not of 22-foot clearance, and a number not even of 18-foot clearance. It is also pointed out that, on the Hastings & Dakota Division of the plaintiff company in the recent depression of tracks made under an agreement between the plaintiff company and the city, the clearances range slightly over 18 feet. As to the crossings other than those on the Hastings & Dakota Division, it is to be noted that they are mostly of old construction. As to those on the Hastings & Dakota Division, the evidence shows that they were put in with the expectation that very little, if any, switching would be done along the stretch of the track where these overhead crossings were made. Owing to litigation, this expectation has not been realized; and the result is that the clearances on that division, although of recent construction, are condemned by practical railroad men as unsatisfactory and unsafe, and admitted to be so by the plaintiff company itself.

My conclusion on this point is that the evidence clearly shows that, with the present size of cars in common use, an 18-foot clearance is insufficient and unsafe. When adopting the ordinance here in question the city council adopted that clearance probably because it was thought to be the greatest practically available, and because it was thought sufficient. The evidence in this case shows that both of these opinions were erroneous.

4. That the difficulties and dangers in the operation of the railway tracks would be increased in the depression beyond what they are at present is clearly shown by the evidence, and is practically conceded. Accumulation of ice and snow at times, accumulation of steam, smoke, and gases at more frequent intervals, interfering with efficient communication by signals, would all tend to increase the difficulty of operation of the trains. The presence of uprights between tracks as supports of bridges would also add to the inconvenience of operation. Change in gradient into and out of the company's yard at Twenty-Sixth street is shown by the evidence to be a matter of serious moment. To what extent the dangers, difficulties, and cost of operation would be increased is not capable of exact computation; that it would be considerable admits of little doubt, under the evidence.

5. As to changes in sewer system, water mains, etc., the estimate of cost agreed upon by both parties is $346,790. The changes in respect to these matters made necessary in connection with Lake street alone amount to $90,000.

6. Considered with reference to the Chicago, Rock Island & Pacific Railway Company, whose freight terminals lie between plaintiff's tracks and Eighth Avenue South, and with reference to the various industries along the tracks of the plaintiff company, the proposed depression is a serious matter. The evidence shows that the cost of the changes made necessary in the Rock Island terminals and freighthouses would be more than $500,000.

The evidence also discloses that the changes necessary to be made to adjust such of the industries along the Milwaukee tracks as can be adjusted to the depression plan would be more than $1,500,000. In the case of the Minneapolis Steel & Machinery Company alone, the evidence shows that the cost of adjustment would be approximately $600,000, and for the Minnesota Linseed Oil Company more than $200,000. The total cost to the plaintiff railway company would be more than $5,000,000.

To many of the industries, trackage facilities could be furnished only by a spur having a considerable grade up from the railway tracks. The evidence shows that such spurs with a downward grade towards the railway tracks are unsatisfactory as to service, and often a source of great danger.

[4] But the city contends that all of these matters, except the statutory obstacle to the 18-foot clearance, are matters merely of increased expense, increased difficulty, and increased dangers in operation; and, it being conceded that the public necessity and the public good demand the separation of street grade from railway grade, these matters of expense, difficulties, and dangers must not be allowed to stand in the way of public improvements which the general public necessity or the public good demands. The contention, in the main, is sound, but there is one consideration that must not be overlooked. An ordinance such as the one here in question is always open to the inquiry:

"Is it unnecessary or unreasonable or arbitrary to such an extent that it can fairly be said that its enforcement will have the effect of depriving the complaining parties of their property without due process of law?"

[5] The presumption is in favor of the ordinance; the burden of proof is upon him who attacks its validity. It being conceded that the object to be accomplished by the ordinance is necessary, it would follow that if there were but a single method to accomplish that result, an ordinance providing that method could not be adjudged unnecessary, unreasonable, or arbitrary, except under most unusual circumstances.

The plaintiff contends, however, that here there is an alternative method of bringing about the separation of the street grade from the railway grade, namely, by elevation of the railway tracks. The plaintiff railway company claims, where there are two methods of separation of grade, each providing equally well for the safety of the public, that the choice lies with the railway company. On the other hand, the city contends that the choice belongs to it. It is not necessary to decide the question which party has the choice of methods; for the purpose of this decision, I assume that the choice of methods lies with the city.

[6] But the plaintiff is entitled to show, if it can, that there is another feasible method, and it claims that the elevation method is feasible. Plaintiff is also entitled to show by comparison, if it can, that the depression method provided by the ordinance is unnecessary, unreasonable and arbitrary. A large amount of evidence has been introduced by plaintiff in support of this contention, and by defendant in opposition thereto. It is at once evident that certain elements of the situation require no attention in considering the elevation plan. The questions of subsoil, clearance, difficulties and dangers of operation due to accumulation of steam, smoke, and gas in the depression, difficulties and dangers from the presence of uprights between the tracks, are all absent on the elevated plan. The evidence also shows that none of the present five tracks would be sacrificed upon the elevated plan. The question of sewers, water mains, and other substructures also practically disappears.

As to the Chicago, Rock Island & Pacific Railway, the evidence shows that adjustment upon the elevated plan would cost about one-half less than on the depression plan.

The evidence also shows that from the standpoint of that railway, the elevated plan is preferable.

As to the industries, the evidence shows that adjustments can be made more readily upon the elevated plan, and the service be better than on the depression plan, and at a cost of one-third to one-half less than on the depression plan.

[7] Whether the owners of the industries have or have not vested rights in their present facilities, they are, in all fairness, entitled to be heard upon the question of the reasonableness of the ordinance.

The spurs leading from the railway tracks to the industries would have a less steep grade, and these would tend away from the railway tracks instead of toward them. This advantage to the railway com-

pany, however, would be offset to some extent by the disadvantage to the industries in having the spurs on a downward grade in their direction.

The total expense to plaintiff railway company of the elevated plan when compared with that of the depression plan shows a difference of more than $3,000,000 in favor of the elevation plan. On the whole, the conclusion cannot be escaped that from the standpoint of the railway company and the industries, the elevated plan is far more satisfactory and cheaper both in initial and in operative cost. However, there is another viewpoint to be considered, namely, that of the general public, either as traveling upon the streets of the city, or as having business or property interests near the line of the railway.

It is claimed by the city that the uprights in the streets supporting the railway trackage over the streets would be a serious obstacle to ordinary traffic, and would interfere with the movement of the fire department and also the sewer apparatus; that the undercrossings would themselves be dark, dangerous, and unsanitary; that the bridges over the streets and the embankment of the elevated structure would be unsightly. It goes without saying that three rows of uprights, two at the curbs and one in the center of the street, would form more or less of an obstruction in the street. The evidence does not justify the conclusion, however, that this would be a serious obstruction to traffic. The evidence also fails to show that the interference with fire or sewer apparatus would be anything more than slight and negligible. Furthermore, the evidence shows that it would not be indispensable to have three rows of upright supports in the street. By having some of the bridge structure project above the railway roadbed some of the supports in the street below might be dispensed with. It is true that the benefit to the street below would be obtained at the expense of the roadbed above; but, after 25 years of conference and negotiation, it must be evident to all parties to the controversy that ideal conditions in every respect are not obtainable as a solution of the problem.

The claim that the undercrossings would be necessarily dark, dangerous, and unsanitary is shown by the evidence to be unfounded in fact.

Whether an embankment with railway tracks thereon is a more unsightly object than a railway cut with similar tracks therein is a question of judgment, upon which, as the evidence shows, men differ. The question, however, is not of controlling importance in this case; and it has been suggested that if it were incumbent on the city to pay any considerable portion of the additional cost of depression over elevation, the embankment might appear less unsightly.

[8] As already stated, the total cost of depression to plaintiff company would be more than $5,000,000. At the Twenty-Sixth street yard the tracks come to their present level, and then going south are depressed a second time to make the Lake street crossing. The evidence shows that the cost of depression made necessary by this one crossing is over $500,000. If the cost of adjusting the Minneapolis Steel & Machinery Company's plant be added, the total cost is over $1,000,000. The evidence shows that the cost of elevation for the crossing at Lake street would be about $150,000; and if to this be

added the cost of adjusting the Minneapolis Steel & Machinery Company's plant on the elevation plan, the total cost is about $400,000. Thus there is a difference of about $600,000 between the plans, due to this one crossing alone.

The evidence fails to show any necessary connection between the Lake street crossing and the depression of the tracks north of the Twenty-Sixth street yard, so far as the physical surroundings or conditions are concerned, and that there is no such necessary connection from an engineering standpoint is also shown by the evidence. Mr. Cappelen, the city engineer, testified in reference to this matter, and his views are so frank and his opinion so well founded in reason, that I quote them here at some length:

"In all these discussions of depression of the main line from Twenty-Fourth street to Sixth Avenue South, Lake street was never considered. It was always considered as a problem of its own. At one of the eleventh-hour motions, a member of the city council said (probably I should not speak about that): 'If we are going to do that, let us slap it on. Let us add Lake street, so as to get it bridged too.' Now, in my opinion, we are, under this ordinance plan at this place, charging up $90,000 to somebody for a sewer system to get that one bridge in. We are charging up a heavy expense on the Milwaukee Road for rearrangement. According to Mr. Record's testimony, we are charging up a tremendous expense to Mr. Record to readjust his plant. Now, it is my firm conviction that we had better erase Lake street. We have only made a difference of 4 feet now. We will take and raise up Lake street 13 feet or maybe a little more, and nobody is going to get hurt at all. You can buy that property along there—you might have to meet legal remedy for damages—but you could get it for a fraction of the $90,000 that it is going to cost you to get that sewer in, which don't do anybody any good. The sewer system there is all right as it is. You can readily see that we will take Lake street over the tracks and adjust it, and instead of going down that 17 feet, or going down 21 feet, we will go up with Lake street, and you can adjust the whole business for a fraction of the money. I say that is what ought to be done."

The other evidence in the case bearing on this matter of the Lake street crossing is equally condemnatory. In fact, the evidence as a whole leaves no conclusion open but that the ordinance, so far as the Lake street crossing is concerned, is unnecessary, unreasonable, and arbitrary to such an extent as to deprive the plaintiff and Minneapolis Steel & Machinery Company of property without due process of law.

[9] But it is claimed on the part of the city that even though this part of the ordinance should be found unreasonable and void, yet the court might so hold, and nevertheless hold the remainder of the ordinance valid and enforceable. The city takes the position that there is no necessary connection of any kind between the provisions of the ordinance in regard to Lake street and the provisions of the ordinance in regard to the remainder of the crossings. But though the evidence fails to show any necessary connection between the plan of depression of the railway tracks at Lake street and the plan of depression north of the Twenty-Sixth street yard from a physical standpoint, or from an engineering standpoint, yet that there was some connection in the minds of the city council is made certain by the testimony of Mr. Cappelen, and also from the record of what took place in the council prior to the time of the passage of the ordinance. Referring again to

238 F.—26

Exhibit B, the record of the special committee on grade elimination, we find the following:

"Your special committee on grade elimination respectfully recommend that the city engineer be instructed to draw plans for the depression of the Chicago, Milwaukee & St. Paul main line to the feasible maximum depth, from the Milwaukee Depot to Twenty-Sixth street, and the city attorney be instructed to draw an ordinance to conform with said plans."

Thereafter it was moved:

"That the foregoing report be amended by striking out the word and figure 'Twenty-Sixth street,' where the same appears in the above report, and inserting in lieu thereof, the words and figure 'Twenty-Seventh avenue, including the I. & M. Division of the Milwaukee Railway to East Lake Street,' and moved that the city attorney and the city engineer be directed to prepare plans and ordinance and submit the same within sixty (60) days to the city council, for lowering the tracks in accordance with the above report."

But it is contended by the city that the court has the power to hold, and should hold, that the ordinance is valid as to all the trackage involved, except that connected with the Lake street crossing, even though this part of the ordinance be held invalid.

[10] It is true that statutes and ordinances may be and sometimes are held by the courts valid in part and invalid in part. The test is, Has the legislative body manifested an intention to deal with a part of the subject-matter covered, irrespective of the rest of the subject-matter? If such intention is manifest the subject-matter is separable, otherwise not.

In Poindexter v. Greenhow, 114 U. S. 270, the court in its decision at page 304, 5 Sup. Ct. 903, 922 (29 L. Ed. 185) used the following language:

"It is undoubtedly true that there may be cases where one part of a statute may be enforced as constitutional, and another be declared inoperative and void, because unconstitutional; but these are cases where the parts are so distinctly separable that each can stand alone, and where the court is able to see, and to declare, that the intention of the Legislature was that the part pronounced valid should be enforceable, even though the other part should fail. To hold otherwise would be to substitute for the law intended by the Legislature one they may never have been willing by itself to enact."

In El Paso, etc., Ry. Co. v. Gutierrez, 215 U. S. 87, the court, in its decision at page 97, 30 Sup. Ct. 21, 25 (54 L. Ed. 106), used the following language:

"It remains to inquire whether it is plain that Congress would have enacted the legislation had the act been limited to the regulation of the liability to employés engaged in commerce within the District of Columbia and the territories. If we are satisfied that it would not, or that the matter is in such doubt that we are unable to say what Congress would have done omitting the unconstitutional feature, then the statute must fall."

See, also, Illinois Central R. R. Company v. McKendree, 203 U. S. 514, 27 Sup. Ct. 153, 51 L. Ed. 298; Employers' Liability Cases, 207 U. S. 463, 28 Sup. Ct. 141, 52 L. Ed. 297; Butts v. Merchants' Transportation Co., 230 U. S. 126, 33 Sup. Ct. 964, 57 L. Ed. 1422.

Whatever the rule is in the state courts, in the federal court the rule announced in the above cases is controlling.

If we apply these tests to the case at bar, it is clear that the evidence fails to show any intention on the part of the city council that the ordinance should be enforced as to the trackage north of the Twenty-Sixth street yard, even if unenforceable as to the trackage connected with the Lake street crossing. Indeed, the history of the preparation and passage of the ordinance as shown by the evidence indicates a directly opposite intention. The ordinance was framed for the purpose of solving one problem, namely, track depression between two definite points named in the ordinance.

The position of counsel for the city in regard to the question now under discussion is hardly consistent with the action of the city council itself. Since the commencement of this suit the city council has by its own action eliminated from the ordinance section 18 relating to the Sixth Avenue South crossing. The city council has also passed another ordinance relating to this same crossing. The ordinance has thus been twice under reconsideration. It is apparently the judgment of the city council, and has been since the preparation of the ordinance in suit, that the Lake street crossing is not a separable, but an inseparable, part of the ordinance plan of depression. It is far from certain that the ordinance could or would have been passed without the inclusion of the Lake street crossing therein.

The court is asked in effect to change the reading of section 1 of the ordinance, so that the sentence now reading, "Beginning at the east line of Sixth Avenue South in the city of Minneapolis, and extending southeasterly to Thirty-Second Street East, in said city" shall read, "Beginning at the east line of Sixth Avenue South in the city of Minneapolis, and extending southeasterly to some point to be determined by the court." In my opinion, there is no power in the court to make such a change. The ordinance must stand or fall as a whole.

Much evidence has been introduced on both sides touching the cost of a 21-foot depression, and as to the possibility of adjustment by the Chicago, Rock Island Railway Company to such depression and the cost of adjustment, and the possibility of adjustment of the various industries to such depression, and the cost thereof. The contention of the plaintiff is that a 17-foot depression plan is so unsafe as to make it beyond possibility of adoption, and that nothing less than a 21-foot or a 22-foot headroom ought to be considered. A 22-foot clearance can be obtained by a 21-foot depression. Comparisons have accordingly been insisted upon by the plaintiff between the 21-foot depression plan and the plan of elevation. It goes without saying that such a comparison makes a much stronger case against the depression plan, not only so far as concerns the cost to the plaintiff company, but also in relation to the possibility of adjustment by the industries and the cost thereof, and the possibility of adjustment by the Chicago, Rock Island & Pacific Railway Company and the cost thereof. The evidence shows that the total cost to the railway company under the 21-foot depression plan would be approximately $7,000,000 as compared with less than $2,000,000 under the elevation plan; that the cost to the Minneapolis Steel & Machinery Company

alone would be more than $1,000,000, as compared with $250,000 on the elevation plan. The difficulties of adjusting the spurs and the grades of the spurs would also be increased. The cost and difficulties of operation in the 21-foot depression, due to ice, snow, steam, gas, etc., would also be enhanced. The cost of readjusting the sewers would be increased over the 17-foot depression plan by over $30,000. While recognizing the full force of these figures, I have confined the foregoing discussion of the ordinance to the 17-foot depression plan. This has been done for two reasons: First, because the ordinance plan is the one whose merits and defects are directly before the court, and that plan, as shown above, is a 17-foot plan of depression; second, because even if the city council were convinced that a 21 or 22 foot headroom was required by the statute and good railroading, there is no certainty that it would require a 21-foot depression, even though they might still insist upon the depression plan. It is perfectly possible that a portion at least of the extra headroom required might be furnished by raising the streets to the extra height, rather than by depressing the railway tracks.

Evidence has also been introduced touching the amount of damages to adjoining trackage property on the depression plan and on the elevation plan; also the effect under the two methods upon the value of real estate at some distance from the railway tracks. Opinions of the witnesses, apparently well informed and honest in their convictions, have differed so widely in regard to these estimated damages that I have reached the conclusion that the testimony is too speculative and uncertain to be of any particular value in the present discussion; and such damages have not been included in the foregoing figures.

Many matters other than those discussed here have been covered by the evidence, consisting of more than 2,500 pages of testimony, and several hundred exhibits. These matters have not been overlooked, but, in the interest of reasonable brevity, have been omitted from specific mention.

[11] The police power of the state, whether exercised through the Legislature or municipalities, is very broad. It may be exercised for the safety, health, morals, convenience, or the general prosperity of the public; but it is not without limitation. When the police power exercised by a municipality is by means of an ordinance, such ordinance must have some relation to one or more of the objects above mentioned. The ordinance must not conflict with state or federal Constitution, nor with state or federal statutes. It must not arbitrarily, unnecessarily, or unreasonably invade private rights or property. Yick Wo v. Hopkins, 118 U. S. 356, 6 Sup. Ct. 1064, 30 L. Ed. 220; C., B. & Q. Ry. v. Illinois, 200 U. S. 561, 593, 26 Sup. Ct. 341, 50 L. Ed. 596, 4 Ann. Cas. 1175; City of Emporia v. At., T. & S. F. Ry., 94 Kan. 718, 147 Pac. 1095; Am. Tobacco Co. v. Missouri Pac. Ry., 247 Mo. 374, 157 S. W. 502; Chicago v. Pittsburgh, C., C. & St. L. Ry., 244 Ill. 220, 91 N. E. 422; Murphy v. C., R. I. & P. Ry., 247 Ill. 614, 93 N. E. 381.

In the present case, upon a careful consideration of the whole

of the evidence, I have reached the conclusion that the ordinance in question is unreasonable, arbitrary, and void, and that the enforcement thereof would deprive the plaintiff and the interveners of their property without due process of law: First, because its provisions are in conflict with the statute of the State of Minnesota; second, because it includes within its scope the Lake street crossing, and such inclusion, as shown by the evidence of both the plaintiff and the defendant, is unnecessary, unreasonable, and arbitrary.

[12] Third, because the ordinance, while providing for a separation of railway and street grades, unnecessarily and unreasonably imperils the safety of the railway employés, and imposes unnecessary and unreasonable expense upon the plaintiff railway company, and the intervening railway company and industries, to the extent of several million dollars, amounting to a practical confiscation of their property.

A decree may be prepared in accordance with these views, and directing that a permanent injunction issue against the defendant city, its officers, agents, and servants, restraining and enjoining them from in any manner enforcing, or attempting to enforce, the ordinance in question.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes